Allan Michael RUSS, Bea Smith and Ann Hall, individually and on behalf of all others similarly situated

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Aetna Casualty and Surety Company and American International Insurance Company.

Civil Action No. 96–2650.

United States District Court, E.D. Pennsylvania.

March 31, 1997.

*OPINION*

LOUIS H. POLLAK, District Judge.

Plaintiffs have moved that this class action case be remanded to the Philadelphia County Court of Common Pleas, pursuant to 28 U.S.C. § 1447. They state that, although the parties are diverse, the amount in controversy for each plaintiff is less than $50,000 and that therefore this court lacks subject matter jurisdiction. Defendants State Farm Mutual Automobile Insurance Company ("State Farm") and American International Insurance Company ("AIIC") oppose the plaintiffs' motion; defendant Aetna Casualty and Surety Company ("Aetna") joins in these defendants' opposition.[1]

As stated in the complaint, the individual plaintiffs seek to become representatives of a class of persons

> who were insured by the defendants as part of the 'Assigned Risk' auto insurance plan mandated under state law, and were thereafter assigned the "Limited Tort Option" by the defendant insurance companies and their agents, without having all the statutorily mandated information prior to signing the election forms used by the defendants. The election form used by these defendants failed to give the annual premium price for each option choice, i.e. the "full" tort option and the "limited" tort option information which is mandated in the [Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. § 1705 *et. seq.*]. Without this required information, the defendants failed to afford the individual plaintiffs and members of the Class an opportunity to make a *knowing and voluntary waiver of the "full tort" option*, which if elected, gives an insured and the members of his/her household covered by the policy, an unrestricted right to seek financial compensation for non-economic damages resulting from an automobile accident.

---

1. Plaintiffs have filed a motion to strike defendant Aetna Casualty and Surety Company's joinder in the oppositions to plaintiffs' motion for remand filed by defendants State Farm and AIIC. In this motion, plaintiffs contend that because defendant Aetna did not file a timely response to the motion to remand, Aetna should be deemed to have withdrawn its consent to removal of this action to federal court. This argument is without merit. Aetna's failure to respond in a timely manner to plaintiff's remand motion, when two of its co-defendants responded at length, in no way establishes that the removal to this court is invalid.

Complaint ¶ 1. The complaint alleges seven causes of action, with differing remedies under each: (1) violation of the Pennsylvania Unfair Trade Practice and Consumer Protection Law, 73 Pa.S. § 201–1 *et. seq.*, for which the plaintiffs seek the return of their insurance premiums, treble costs, and attorney's fees; (2) bad faith pursuant to 42 Pa.C.S. § 8371, for which the plaintiffs seek attorney's fees, interest, and punitive damages; (3) breach of fiduciary duty, for which the plaintiffs seek compensatory and punitive damages and attorney's fees; (4) constructive and actual fraud, for which the plaintiffs seek compensatory and punitive damages, attorney's fees, the return of plaintiffs' premiums, and treatment of all policies issued wrongfully as full tort option policies; (5) negligent misrepresentation, for which the plaintiffs seek damages, attorney's fees, the return of plaintiffs' premiums, and treatment of all policies issued wrongfully as full tort option policies; (6) breach of implied covenant of good faith and fair dealing, for which the plaintiffs seek compensatory and punitive damages, attorney's fees, and treatment of all policies issued wrongfully as full tort option policies; and (7) money had and received, for which the plaintiffs seek compensatory and punitive damages and attorney's fees, or in the alternative the return of plaintiffs' premiums.

The defendant insurance companies assert that this court has jurisdiction on the basis of diversity of citizenship. Plaintiffs each reside in Pennsylvania, while State Farm is incorporated and headquartered in Illinois, Aetna is incorporated and headquartered in Connecticut, and AIIC is incorporated and headquartered in New York. The question, then, is whether the diversity jurisdiction statute's $50,000 amount in controversy requirement has been met. *See* 28 U.S.C. § 1332.

■ On a motion to remand, the burden is on the defendants to establish federal court jurisdiction. *See Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir.1990). The court must decide the amount in controversy from the complaint itself. *See Angus v. Shiley, Inc.*, 989 F.2d 142, 145 (3d Cir. 1993). The task in this case is complicated by the complaint's lack of specificity. Indeed, Pennsylvania's rules of civil procedure prohibit plaintiffs from demanding a specific sum. *See* Penn.R.Civ.P. 1021. Nonetheless, the Third Circuit has instructed that, in a case removed to federal court, "the amount in controversy is ... measured ... by a reasonable reading of the value of the rights being litigated." *Angus,* 989 F.2d at 146. I will therefore proceed to assess the value of the rights claimed by plaintiffs in this case.

Plaintiff's counsel asserts that even were any of the plaintiffs to recover the premiums they have paid, their full medical expenses from their accidents, and treble damages, their recovery would still not exceed $50,000. Defendants respond that the amount in controversy is met by the plaintiff's claims for punitive damages and attorney's fees. *See Bell v. Preferred Life Assurance Society,* 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (1943) (punitive damages includable in amount in controversy); *Missouri State Life Insurance Company v. Jones,* 290 U.S. 199, 54 S.Ct. 133, 78 L.Ed. 267 (1933) (same for attorney's fees authorized by law).

■ I conclude that the amount in controversy regarding plaintiff Allan Russ's claim exceeds $50,000. According to the complaint, Russ was involved in a motor vehicle accident and defendant State Farm failed to recognize and honor his claim for non-economic damages; State Farm asserted that these damages were limited by Russ's election of the limited tort option. Complaint ¶ 30. Plaintiffs' motion for remand states that as a result of his auto accident, Mr. Russ sustained personal injuries with medical bills, or "specials," totalling $8,040.00. *See* Pls.' Memo of Law at 8; Pl.'s Reply Memo of Law at 5 n. 3. Plaintiffs also add, however, that "because plaintiffs' claims for personal injury are so low, the total monetary value of any claim plaintiffs would ultimately submit to defendants for compensatory damages for the loss of the right to recover in full tort is likewise minimal." Pls.' Memo of Law at 8.

Plaintiffs fail to provide any support for their assertion that the value of a lost claim for pain and suffering is "minimal." Under the limited tort option, Mr. Russ was denied the ability to claim damages for pain and

suffering for injuries other than a "serious injury," that is, a "personal injury resulting in death, serious impairment of body function or permanent serious disfigurement." 75 Pa. C.S. § 1702. The record is silent as to Mr. Russ's injury. However, it is not unreasonable to expect that an injury resulting in $8,000 worth of medical bills and potentially causing moderate—if not serious—impairment of body function or permanent moderate disfigurement could result in a jury award of $16,000 for pain and suffering. Pennsylvania's Unfair Trade Practice and Consumer Protection Law—plaintiffs' theory under Count 1 of the complaint—authorizes treble damages and attorney's fees, *see* 73 Pa.S. § 201–9.2; *Neff v. General Motors Corp.*, 163 F.R.D. 478, 483 (E.D.Pa.1995); *Hammer v. Nikol*, 659 A.2d 617, 620 (Pa. Commw.Ct.1995). Trebling a $16,000 award for Russ's lost pain and suffering claim, and adding a reasonable attorney's fee, I conclude that "a reasonable jury ... could ... value[ ] [Russ's] losses at over $50,000." *Angus*, 989 F.2d at 146.

[redacted] The same is not true of the other plaintiffs, both named and unnamed. Plaintiffs Bea Smith and Ann Hall were involved in motor vehicle accidents, but "did not pursue [their] rightful remedies" under their insurance policies. Complaint ¶¶ 31, 32. This assertion is too vague to allow me to conclude that these plaintiffs have lost a valuable claim for pain and suffering stemming from their accidents. These plaintiffs—as well as the purported class members who were never involved in any accident—appear to have sustained damages involving no more than the denial of their opportunity to make an informed choice; such damages would likely be small in the absence of evidence of lost claims. Moreover, some class members presumably would have chosen the limited tort option even had they been given the full information the plaintiffs allege was not provided them; these plaintiffs' damages would indeed be minimal. Even adding punitive damages and attorney's fees to these various claims, I find that, for these plaintiffs, a "reasonable reading of the value of the rights being litigated" does not exceed $50,000.

[redacted] The foregoing establishes (1) that the complaint alleges, with respect to named plaintiff Russ, a claim pursuant to which recovery might be had for a sum in excess of $50,000, thereby satisfying the jurisdictional amount called for by 28 U.S.C. § 1332, but (2) that neither of the claims alleged on behalf of the two other named plaintiffs, nor any of the claims alleged on behalf of the unnamed putative class members, reaches the jurisdictional amount. The question then arises whether, in the exercise of the "supplemental jurisdiction" described in subsections (a), (b) and (c) of section 1367 of the Judicial Code, 28 U.S.C. § 1367(a), (b) and (c),[2] this court has subject matter jurisdiction of this proposed class action. If section 1367 is parsed literally, the answer would appear to be in the affirmative. But whether such a

2. **Supplemental jurisdiction**

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24, of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection
(a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

literal reading of section 1367 is appropriate is a question of some intricacy. In order to address that question fully, it will be useful *first* to canvass the principal cases antedating section 1367, and *second* to examine the text and legislative history of section 1367 itself.

### I.

In 1939, in *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939), the Supreme Court had before it an appeal from a decree of a three-judge district court permanently enjoining enforcement of a California statute which imposed fees in the amount of $15 per automobile driven into California with a view to being sold in that state; the California regulatory scheme was found by the district court to be unconstitutional, offending both the commerce clause and the Fourteenth Amendment. The Supreme Court reversed. But, before reaching the merits, the Court *sua sponte* addressed the issue of the district court's subject matter jurisdiction: specifically, the Court pursued the question whether the claims of the plaintiffs—"numerous individuals, copartnerships and corporations," *id.* at 587, 59 S.Ct. at 747—exceeded $3,000 and thereby satisfied the then prevailing standard of jurisdictional amount. On the basis of the record before it, the Court, speaking through Justice Stone, concluded that the captioned lead plaintiff, Paul Gray, Inc., was the only plaintiff presenting a claim which by itself reached the jurisdictional threshold. With matters in this posture, the Court concluded that the scope of the district court's jurisdiction was controlled by the "familiar rule that when several plaintiffs assert separate and distinct demands in a single suit, the amount involved in each separate controversy must be of the requisite amount to be within the jurisdiction of the district court, and that those amounts cannot be added together to satisfy jurisdictional requirements." *Id.* at 589, 59 S.Ct. at 748. This meant that the district court only had jurisdiction with respect to the claim of Paul Gray, Inc.

Not long after the decision in *Clark v. Paul Gray, Inc.*, the Second Circuit had occasion to consider whether, in the context of a diversity class action brought pursuant to Rule 23 of the Federal Rules of Civil Procedure (the original Rule 23 of the then new Rules), it was permissible to aggregate the class members' claims in order to reach the jurisdictional amount. The Second Circuit's answer, delivered by Judge Clark, joined by Judges Swan and Augustus Hand, was in the negative. Where a "class [can] be found only in the 'spurious' sense that a common question of law and fact [is] involved ... aggregation is improper regardless of whether other members of the class purport to join in the original complaint or intervene to submit to the adjudication." *Hackner v. Guaranty Trust Co. of New York*, 117 F.2d 95, 98 (2d Cir.1941). Six years later—in 1947—the Second Circuit reaffirmed the conception of diversity class actions adopted in *Hackner*; that decision—said Judge Frank, joined by Judges Learned Hand and Augustus Hand— "held that a proceeding under 23(a)(3) is, in effect, but a congeries of separate suits so that each claimant must, as to his own claim, meet the jurisdictional requirements." *Steele v. Guaranty Trust Co. of New York*, 164 F.2d 387, 388 (2d Cir.1947).

Following the 1966 reconstruction of Rule 23, the Supreme Court, in *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), considered—in the context of diversity class actions in which no named plaintiff's claim reached the jurisdictional amount— whether the established non-aggregation rule still held. Speaking through Justice Black (over a dissent by Justice Fortas, joined by Justice Douglas), the Court ruled that abandonment of the non-aggregation rule in class actions would undercut the congressional "purpose ... to check, to some degree, the rising caseload of the federal courts." *Id.* at 339–40, 89 S.Ct. at 1058. The Court went on to say:

> The expansion of the federal caseload could be most noticeable in class actions brought on the basis of diversity of citizenship. Under current doctrine, if one member of a class is of diverse citizenship from the class opponent, and no nondiverse members are named parties, the suit may be brought in federal court even though all other members of the class are citizens of the same State as the defendant and have nothing to fear from trying the lawsuit in

the courts of their own State. See *Supreme Tribe of Ben–Hur v. Cauble*, 255 U.S. 356 [41 S.Ct. 338, 65 L.Ed. 673] (1921). To allow aggregation of claims where only one member of the entire class is of diverse citizenship could transfer into the federal courts numerous local controversies involving exclusively questions of state law. In *Healy v. Ratta*, 292 U.S. 263 [54 S.Ct. 700, 78 L.Ed. 1248] (1934), this Court noted that by successively raising the jurisdictional amount, Congress had determined that cases involving lesser amounts should be left to be dealt with by the state courts and said:

> "The policy of the statute calls for its strict construction.... Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." 292 U.S. 263, 270 [54 S.Ct. 700, 703].

*Id.* at 340, 89 S.Ct. at 1059.

In 1973, in *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), the Court again addressed the issue of establishing the requisite jurisdictional amount in a class action diversity case. In *Zahn*—as was not true in *Snyder v. Harris*, but as is true in the case at bar—one of the named plaintiffs had a claim which satisfied the jurisdictional amount. But this distinction was held by the *Zahn* Court to be non-dispositive. Speaking through Justice White (over a dissent by Justice Brennan, joined by Justices Douglas and Marshall), the Court held that the rule of *Snyder v. Harris* was controlling:

> *Snyder* invoked the well-established rule that each of several plaintiffs asserting separate and distinct claims must satisfy the jurisdictional-amount requirement if his claim is to survive a motion to dismiss. This rule plainly mandates not only that there may be no aggregation and that the entire case must be dismissed where none of the plaintiffs claims more than $10,000 but also requires that any plaintiff without the jurisdictional amount must be dis-

missed from the case, even though others allege jurisdictionally sufficient claims.

> This follows inescapably from the Court's heavy reliance on *Clark v. Paul Gray, Inc., supra*, where only one of several plaintiffs had a sufficiently large claim and all other plaintiffs were dismissed from the suit.

*Id.* at 300, 94 S.Ct. at 511.

And the Court concluded:

> It also seems to us that the application of the jurisdictional-amount requirement to class actions was so plainly etched in the federal courts prior to 1966 that had there been any thought of departing from these decisions and, in so doing, of calling into question the accepted approach to cases involving ordinary joinder of plaintiffs with separate and distinct claims, some express statement of that intention would surely have appeared, either in the amendments themselves or in the official commentaries. But we find not a trace to this effect. As the Court thought in *Snyder v. Harris*, the matter must rest there, absent further congressional action.

*Id.* at 302, 94 S.Ct. at 512.

Without "further congressional action" overruling *Zahn*, a diversity class action complaint of the sort presented to this court by plaintiff Russ and co-plaintiffs Smith and Hall—i.e., a complaint describing a class action in which one of the named plaintiffs is the only class member whose claim satisfies the jurisdictional amount—would not present a case within the subject matter jurisdiction of a federal district court. The question presented to this court by the Russ/Smith/Hall complaint is whether section 1367 of the Judicial Code, enacted in 1990, is "further congressional action" that has effectively overruled *Zahn*. As will be shown below, section 1367, on its face, appears to have accomplished that result. But before I directly address whether section 1367 should be taken at face value, I will briefly summarize the post-*Zahn* Supreme Court decisions that preceded—indeed, precipitated—the enactment of section 1367.

*Zahn*, decided in 1973, was the Supreme Court's last case focusing on the aggregabili-

ty for jurisdictional amount purposes of the claims of members of a plaintiff class. However, in a series of subsequent cases the Court, in non-class action contexts, narrowed the discretionary authority of a district court, in implementation of its jurisdiction over a claim properly before the court, to exercise "pendent" (or, as it was frequently called, "ancillary") jurisdiction over a claim having no independent federal jurisdictional vitality but factually so closely related to the principal claim as to constitute part of the same "case" or "controversy" within the meaning of Article III of the Constitution. The classic explication of pendent jurisdiction had been Justice Brennan's 1966 opinion (seven years prior to *Zahn*) for the Court in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), in which the Court had specified that pendent jurisdiction could exist only where the principal claim and the pendent claim "derive from a common nucleus of operative fact." *Id.* at 725, 86 S.Ct. at 1138. The post-*Zahn* cases narrowing *Gibbs* were ones in which a plaintiff sought to join to a jurisdictionally proper claim a claim which, while factually closely related, lacked any independent federal jurisdictional grounding and was directed against a defendant who was not a defendant with respect to the principal claim. The narrowing cases were *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) (barring joinder of a state law claim against a county with federal (42 U.S.C. § 1983) claims against county officials, notwithstanding that the state law claim and the federal claims arose out of same set of operative facts), *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (barring joinder of a state law tort claim against a non-diverse defendant with a state law tort claim against diverse defendant, notwithstanding that both claims arose out of the same set of operative facts), and, finally, *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). In *Finley,* which declined to permit the joinder to a Federal Tort Claims suit against the United States of state law tort suits against other defendants arising out of the same accident, the Court, speaking through Justice Scalia (over dissents by Justice Blackmun

and by Justice Stevens, the latter dissent joined by Justices Brennan and Marshall), concluded its discussion with the following words:

> Whatever we say regarding the scope of jurisdiction conferred by a particular statute can of course be changed by Congress. What is of paramount importance is that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts. All our cases—*Zahn, Aldinger,* and *Kroger*—have held that a grant of jurisdiction over claims involving particular parties does not itself confer jurisdiction over additional claims by or against different parties. Our decision today reaffirms that interpretive rule; the opposite would sow confusion.

*Id.* at 556, 109 S.Ct. at 2010.

## II.

The evident purpose of Justice Scalia's concluding words was to make clear to Congress that the Court, while reluctant to travel unaccompanied down the *Gibbs* path of extension of pendent jurisdiction, was fully prepared to implement congressional directives providing legislative validation of, and an appropriate architectural framework for, such jurisdiction. The first significant proposal for legislative action came in the spring of 1990, a year after *Finley,* in the form of a recommendation by the Federal Courts Study Committee. The Federal Courts Study Committee—a committee presided over by Judge Weis and consisting of six judges, two Senators and two Congressmen, and five lawyers drawn from government, the academy and private practice—had been appointed by the Chief Justice in 1988 pursuant to a statute which "established within the Judicial Conference of the United States, a Federal Courts Study Committee on the future of the federal judiciary," Judicial Improvements and Access to Justice Act, 102 Stat. 4642, Title I, § 102(a), and which called for the submission of a final Committee report to the President, the Congress, the Chief Justice, the Judicial Conference, the Conference of Chief Justices, and the State Justice Institute, by April of 1990.

The Committee's final report, timely submitted on April 2, 1990, contained scores of recommendations. One of these, appearing on pages 47 and 48 of the report, noted—without specific reference to *Finley* or any other case—that "[r]ecent decisions of the Supreme Court raise doubts about the scope of pendent party and ancillary jurisdiction under existing federal statutes," and recommended "that Congress expressly authorize federal courts to hear any claim arising out of the same 'transaction or occurrence' as a claim within federal jurisdiction, including claims, within federal question jurisdiction, that require the joinder of additional parties, namely, defendants against whom that plaintiff has a closely related state claim." *Report of the Federal Courts Study Committee* 47 (1990).[3] Two months later—in June of 1990—Congressmen Robert W. Kastenmeier and Carlos J. Moorhead (respectively, Chairman and ranking minority member of the House Judiciary Committee's Subcommittee on Courts, Intellectual Property, and the Administration of Justice), both of whom had been members of the Federal Courts Study Committee, introduced H.R. 5381, a bill whose purpose—according to the report of the House Judiciary Committee filed on September 21, 1990—was "to implement several of the more noncontroversial recommendations of the Federal Courts Study Committee." H.R.Rep. No. 101–734, at 15 (1990).

Section 114 of H.R. 5381 dealt with "supplemental jurisdiction" and "implement[ed] a recommendation of the Federal Courts Study Committee found on pages 47 and 48 of its Report." *Id.* at 27.

H.R. 5381 was considered by the House of Representatives on September 27, 1990 and approved on that day. As approved, H.R. 5381 was less comprehensive than it had been when introduced in June (certain bankruptcy-related proposals were withdrawn because there had not been sufficient

opportunity for another House subcommittee to consider the proposals), but section 114 was intact. The House discussion was minimal and did not focus on section 114. Subsequent to House approval, H.R. 5381 joined other judiciary-related bills making their way through Congress. Finally, on October 27, 1990, the Senate and the House each approved an omnibus bill, the Judicial Improvements Act of 1990, Public Law 101–650, 104 Stat. 5089. Title III of the new Act was a rejuvenated H.R. 5381—a version very similar to the bill as introduced in June by Congressmen Kastenmeier and Moorhead. Section 114 appeared in renumbered form as section 310(a) of the new Act, and it was codified as section 1367 of the Judicial Code, 28 U.S.C. § 1367.

In the October 27, 1990 Senate floor discussion of the massive Judicial Improvements Act of 1990, the presentation of Title III—the title embodying the legislation responsive to the recommendation of the Federal Courts Study Committee—was handled by Senator Grassley (who, with Senator Heflin, had been members of the Federal Courts Study Committee). Senator Grassley explained that Title III "consists of a number of noncontroversial and somewhat technical recommendations of the Federal Courts Study Committee." 136 *Cong.Rec.* (Oct. 27, 1990) S17578. Senator Grassley did not undertake to explicate the several provisions of Title III; instead he provided a detailed "section-by-section analysis," *id.*, which appears in the Congressional Record. That detailed analysis is a substantially verbatim replication of the September 21, 1990 House Judiciary Committee Report on H.R. 5381, the pertinent portion of which—i.e., the portion dealing with section 114 of H.R. 5381, which was to become section 310(a) of the Judicial Improvements Act of 1990, and which is now codified as section 1367 of Title 28—is considered *infra*. There was no Senate floor discussion of section 310(a).[4]

---

3. The Committee's full discussion of pendent jurisdiction, as it appeared at pages 47 and 48 of its report, is set forth as Appendix A to this opinion.

4. The absence of floor discussion is unsurprising. Title III, which was presented as a congeries of "noncontroversial" technical rearrangements of the judicial structure and process, was of no

general interest to Congress, as compared with other titles of the Judicial Improvements Act of 1990—titles such as Title I, the Civil Justice Reform Act of 1990; Title II, creating new judgeships; and Title IV, establishing the National Commission on Judicial Discipline and Removal.

The Senate pattern was repeated, later on October 27, 1990, on the floor of the House. The presentation of Title III was handled by Congressman Kastenmeier, who reminded his colleagues that they had already approved much of the title a month before as H.R. 5381, embodying "noncontroversial recommendations of the Federal Courts Study Committee." 136 *Cong.Rec.* (Oct. 27, 1990) H13313. There was no House floor discussion of section 310(a).[5]

### III.

#### A. *Section 1367*

In parts I and II of this opinion an attempt has been made to summarize the principal cases leading up to section 1367 and to describe the process by which section 1367 was enacted. Next to be considered is the text of the pertinent portions of section 1367—specifically, subsections (a), (b) and (c)—and the apparent meaning of the text as it applies to the case at bar.

Subsections (a), (b) and (c) of section 1367 are as follows:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs

under Rule 24, of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Subsection (a), in providing for "supplemental jurisdiction over all other claims so related to" a claim or claims validly pending before a district court as to "form part of the same case or controversy," is plainly responsive to *Finley* and to the recommendation of the Federal Courts Study Committee that Congress "expressly authorize federal courts to hear any claim arising out of the same 'transaction or occurrence' as a claim within federal jurisdiction...." [6]

Subsection (b) cuts back part way on subsection (a)'s grant of supplemental jurisdiction when the claim validly pending before the district court is a diversity claim. Under subsection (b) no supplemental jurisdiction attaches to the claim of a plaintiff properly before the court against a party brought in as a third-party defendant under Rule 14 of the Federal Rules of Civil Procedure, or against a party joined pursuant to Rules 19 and 20, or against a party intervening pursuant to Rule 24. Also, no supplemental jurisdiction attaches to a claim by a party proposed to be joined as a plaintiff under Rule 19. Notably missing from the categories of diversity claims which are excepted from the supplemental jurisdiction are diversity claims under Rule 23—i.e., diversity class actions.

---

**5.** See note 4, *supra.*

**6.** See text at note 2, *supra.*

Finally, subsection (c) lists certain categories of situations in which a district court, properly vested with supplemental jurisdiction, has discretion not to exercise that jurisdiction.

In the case at bar, the diversity claim of plaintiff Russ satisfies the required jurisdictional amount so this court has jurisdiction of his claim. Pursuant to subsection (a) of section 1367, the claims of Russ's fellow class plaintiffs, named and unnamed, are sufficiently closely related to Russ's own claim so that supplemental jurisdiction would appear to attach to the other class claims. Those other class claims do not appear to fall within the exceptions to supplemental diversity jurisdiction listed in subsection (b) of section 1367. And none of the subsection (c) grounds for discretionary non-exercise of supplemental jurisdiction appears applicable to the present lawsuit. So, if section 1367 is to be taken at face value, it would appear to contemplate supplemental jurisdiction over diversity class actions, which would mean that this court would be properly seized of the claims presented by Russ and his fellow named plaintiffs and also, if certification of a class should prove appropriate, properly seized of the claims of the unnamed members of the plaintiff class.

## B. *The House Judicial Committee Report*

But there is reason to question whether section 1367's apparent inclusion of diversity class actions in this statutory formulation of supplemental jurisdiction should be taken at face value. For though the letter of the statute supports such inclusion, the pertinent analysis of section 114 of H.R. 5381 (which, in due course, became section 310(a) of the Judicial Improvements Act of 1990 and section 1367 of the Judicial Code) contained in the House Judiciary Committee's September 21, 1990 Report contradicts—flatly contradicts—that reading of the statute. The House Judiciary Committee Report (H.Rep. No. 101–734) states, at pages 28–29:

> Subsection 114(a) generally authorizes the district court to exercise jurisdiction over a supplemental claim whenever it

forms part of the same constitutional case or controversy as the claim or claims that provide the basis of the district court's original jurisdiction.[15] In providing for supplemental jurisdiction over claims involving the addition of parties, subsection (a) explicitly fills the statutory gap noted in *Finley v. United States.*

Section 114(b) prohibits a district court in a case over which it has jurisdiction founded solely on the general diversity provision, 28 U.S.C. § 1332, from exercising supplemental jurisdiction in specified circumstances.[16] In diversity-only actions the district courts may not hear plaintiffs' supplemental claims when exercising supplemental jurisdiction would encourage plaintiffs to evade the jurisdictional requirement of 28 U.S.C. § 1332 by the simple expedient of naming initially only those defendants whose joinder satisfies section 1332's requirements and later adding claims not within original federal jurisdiction against other defendants who have intervened or been joined on a supplemental basis. In accord with case law, the subsection also prohibits the joinder or intervention of persons [as] plaintiffs if adding them is inconsistent with section 1332's requirements. The section is not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to *Finley.*[17]

[15] In so doing, subsection (a) codifies the scope of supplemental jurisdiction first articulated by the Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

[16] The net effect of subsection (b) is to implement the principal rationale of *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

[17] *See Supreme Tribe of Ben–Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921); *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).[7]

The quoted language of the House Judiciary Committee Report leaves no room for doubt: Section 1367 "is not intended to affect the jurisdiction requirements of 28 U.S.C.

[7] So that these paragraphs from the House Judiciary Committee Reports can be read in context,

they and the paragraphs preceding them are set forth as Appendix B to this opinion.

§ 1332 in diversity-only class actions, as those requirements were interpreted prior to *Finley*." As established in part I of this opinion, the pre-*Finley* jurisdictional amount requirement "in diversity-only actions" was that each class plaintiff was required to have a claim satisfying the jurisdictional amount. That was the holding of *Zahn;* and footnote 17 of the House Judiciary Committee Report cites *Zahn.*[8] In short, the House Judiciary Committee Report makes it clear that the intention of the drafters of section 1367 was not to bury *Zahn* but to preserve it.[9]

Should the federal courts be guided by the letter of section 1367 or by what the statute was, indisputably, intended to provide? District courts have been divided on this question.[10] The two circuit courts that have addressed the question—the Fifth Circuit and the Seventh Circuit—have both opted to follow the words of the statute. The Fifth Circuit's rationale (which the Seventh Circuit, "reluctant to create a conflict among the circuits on a jurisdictional issue,"[11] acquiesced in) was as follows:

> We cannot search legislative history for congressional intent unless we find the statute unclear or ambiguous. Here, it is

neither. The statute's first section vests federal courts with the power to hear supplemental claims generally, subject to limited exceptions set forth in the statute's second section. Class actions are not among the enumerated exceptions.

Omitting the class action from the exception may have been a clerical error. But the statute is the sole repository of congressional intent where the statute is clear and does not demand an absurd result. See *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 99–100, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991) (refusing to permit the Court's "perception of the 'policy' of the statute to overcome its 'plain language'"); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 67–69, 115 S.Ct. 464, 467–68, 130 L.Ed.2d 372 (1994) (rejecting lower court's "plain language reading" of a statute where that reading would create a "positively absurd" result). Abolishing the strictures of *Zahn* is not an absurd result.[12]

Considered as general proposition, the reasons advanced by the Fifth Circuit for not looking beyond the language of the statute

---

**8.** The footnote also cites *Supreme Tribe of Ben–Hur v. Cauble*, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921), which held that, in a diversity class action, diversity was sufficiently established if there was diversity of citizenship between one named plaintiff and the defendant or defendants. It will be recalled that Justice Black referred to *Supreme Tribe of Ben–Hur v. Cauble* in his opinion for the Court in *Snyder v. Harris*, quoted *supra* page 11.

**9.** If confirmation were needed, it was supplied by three professors who assisted the Judiciary Committee's Subcommittee on Courts, Intellectual Property, and the Administration of Justice in drafting the supplemental jurisdiction statute. See Thomas M. Megler, Stephen B. Burbank and Thomas D. Rowe, Jr., *Congress accepts Supreme Court's invitation to codify supplemental jurisdiction*, 74 *Judicature* 213, 215 (Dec.–Jan.1991): "Thus, the Supreme Court's holding that only the named class representatives must satisfy the citizenship requirement of section 1332 but that all class members must satisfy the amount in controversy requirement, remain good decisional law." In its Report (page 27, footnote 13) the House Judiciary Committee "expressed its appreciation" for the efforts of, *inter alios*, the three professors.

**10.** *Compare, e.g., Bernard v. Gerber Food Prods. Co.*, 938 F.Supp. 218, 224 (S.D.N.Y.1996), *and*

*Griffin v. Dana Point Condominium Ass'n*, 768 F.Supp. 1299, 1302 (N.D.Ill.1991), *with Deep v. Manufacturers Life Ins. Co.*, 944 F.Supp. 358, 363 (D.N.J.1996), *and Garza v. National Am. Ins. Co.*, 807 F.Supp. 1256, 1258 (M.D.La.1992).

**11.** *Stromberg Metal Works v. Press Mechanical, Inc.*, 77 F.3d 928, 930 (7th Cir.1996).

**12.** *In re Abbott Laboratories*, 51 F.3d 524, 528–29 (5th Cir.1995).

Unsurprisingly, there has been extensive academic commentary. *See* sources cited in *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1045 n. 9 (3d Cir.1993). *See also, e.g.,* Christopher M. Fairman, *Abdication to Academia: The Case of the Supplemental Jurisdiction*, 19 Seton Hall Legisl.J. 157 (1994); Larua L. Hirschfeld, *The $50,-000 Question: Does Supplemental Jurisdiction Extend to Claims Between Diverse Parties Which Do Not Meet 1332's Amount–in–Controversy Requirement?*, 68 Temp.L.Rev. 107 (1995); Thomas D. Rowe, Jr., *Beyond the Class Action Rule: An Inventory of Statutory Possibilities to Improve the Federal Class Action*, 71 N.Y.U.L.Rev. 186 (1996); Darren J. Gold, Note, *Supplemental Jurisdiction over Claims by Plaintiffs in Diversity Cases: Making Sense of 28 U.S.C. § 1367(b)*, 93 Mich.L.Rev. 2133 (1995).

are unexceptionable. After all, as the Supreme Court said in *West Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 98, 111 S.Ct. 1138, 1146–47, 113 L.Ed.2d 68 (1991) (one of the two Supreme Court cases cited by the Fifth Circuit):

> ... [T]he purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone.... The best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous—that had a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process.

For that reason the Court declined to read the statutory phrase "a reasonable attorney's fee," as that phrase is used in 42 U.S.C. § 1988 (the statute providing for fee-shifting in favor of a "prevailing party" in civil rights litigation), to include fees paid to experts.

The problem posed by section 1367 is a very different one. The question is not how to interpret a "phrase" that appears in the enacted statute. The question is whether to accept, without further inquiry, the assumption that the *absence* of a phrase—"Rule 23"—from a statute signifies conclusively that Congress intended that the phrase not be there. In ordinary circumstances, the answer to that question should be in the affirmative, as the Fifth Circuit contends. But the problem posed by section 1367 is not an ordinary circumstance. The problem is one which, so far as I am aware, has no parallel—at least none that has made its way to court. The focal paragraph of section 1367 is subsection (b), and the text of that subsection is cast in a form—references by number to various Federal Rules of Civil Procedure—that makes that text, read in isolation, almost impenetrable to any audience other than specialists in civil procedure in the federal courts. It is hard to believe that, in the Congress which enacted section 1367, there were any members other than the four who were also members of the Federal Courts Study Committee—Congressmen Kastenmeier and Moorhead, and Senators Grassley and Heflin—who, in order to understand section 1367, would have looked to the words of the statute unless they were not furnished any extrinsic aid to understanding. Fortunately, such extrinsic aid was at hand in the form of the House Judiciary Committee Report on H.R. 5381—a report whose detailed section-by-section analysis was made available to the Senate as well as to the House. And the pertinent discussion in that report answers with precision the question whether section 1367 was intended not only to codify supplemental jurisdiction as the Supreme Court suggested in *Finley* but also to overrule another Supreme Court decision—namely, *Zahn*. The precise answer was that *Zahn* was not to be overruled. And that is exactly the answer one would expect, given the assurances made by Congressman Kastenmeier and Senator Grassley to their colleagues that the several provisions of Title III of the Judicial Improvement Act of 1990 were "noncontroversial."

In my view, the proper guide for how to approach the section 1367 problem is not *West Virginia University Hospitals v. Casey*, but rather *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), the other Supreme Court case cited by the Fifth Circuit. There the Court concluded that Congress could not be supposed to have intended the statutory meaning that ordinary rules of syntax appeared to require; accordingly, the Court reconstructed the statute. The Fifth Circuit distinguishes *X–Citement Video, Inc.* on the ground that the Court was there avoiding what the Court characterized as results that would be "positively absurd." 513 U.S. at 69, 115 S.Ct. at 467, whereas the overruling of *Zahn* would not produce "an absurd result." 51 F.3d at 529. It is of course true that overruling *Zahn* would not be absurd; arguably, it would be sensible. But the dominant problem in *X–Citement*, and the dominant problem in the case at bar, is to ferret out what Congress was trying to do. The fact that Congress, in enacting section 1367, might rationally have intended to overrule *Zahn* may have some modest evidentiary weight but can hardly be deemed controlling. In *X–Citement* there was—as both the Court's opinion and the dissent make clear—room for doubt as to what Congress was trying to do. In the case at bar there is no

doubt: there is only one item of legislative history—the relevant section of the House Report—and that item, if one is permitted to refer to it, is conclusive.

Even though it is apparent that section 1367 was not intended to overrule *Zahn*, a persuasive argument could be made that courts should enforce the statute as written if it appeared that reliance interests had accreted around it. But section 1367 is not that kind of a statute. The defendants in this case can hardly be said to have planned any relevant transactions on the understanding that, if sued, they could remove the litigation to a federal court.

Just as there are no reliance interests in play here, so too this is not a case in which the way the statute in question is construed has some substantive consequence for the litigants, whether named or potential. What is at stake is whether this diversity class action is to proceed in a state court or a federal court. Whether kept here or remanded to the Court of Common Pleas, the litigation will proceed not under federal law but under the law (including, if applicable, the conflict of laws law) of the Commonwealth of Pennsylvania.

To retain this case in this court is to say to Congress: "We know what you meant to say, but you didn't quite say it. So the message from us in the judicial branch to you in the legislative branch is: 'Gotcha! And better luck next time.'" Such a message is not required by the separation of powers. Nor is it in harmony with the fact that Congress and the courts, however different their respective roles, are parts of a single government.

Accordingly, the motion to remand will, in an accompanying order, be granted.

### APPENDIX A

#### Report of the Federal Courts Study Committee—Part II

#### Pages 47–48

**b. Congress should expressly authorize federal courts to assert pendent jurisdiction over parties without an independent federal jurisdictional base.**

The terms "pendent" and "ancillary" jurisdiction refer to the authority of federal courts to hear and determine, without an independent basis of federal jurisdiction, claims related to matters properly before them. These supplemental forms of jurisdiction, which may be exercised in the discretion of the federal courts, enable them to take full advantage of the rules on claim and party joinder to deal economically—in single rather than multiple litigation—with matters arising from the same transaction or occurrence. Pendent and ancillary jurisdiction may be used with respect either to additional claims between parties already before the courts (as with compulsory counterclaims) or to claims bringing in new parties (as with impleader of a third-party defendant).

Recent decisions of the Supreme Court raise doubts about the scope of pendent party and ancillary jurisdiction under existing federal statutes. As a result, a litigant with related claims against two different parties—one within and one outside original federal jurisdiction—may have to choose between (1) splitting the claims and bringing duplicative actions in state and federal courts; (2) abandoning one of the claims altogether; or (3) filing the entire case in state court, thus delegating the determination of federal issues to the state courts. The first alternative wastes judicial resources. The second is unfair to the claimant. The third forces litigants to bring a wide variety of federal claims into the state courts and in some cases is unavailable because federal jurisdiction over the federal aspect is exclusive.

Abolishing or radically curtailing pendent and ancillary jurisdiction would eliminate some cases and claims from the federal courts, but this is a situation in which it is unwise to do so. Rather, we recommend that Congress expressly authorize federal courts to hear any claim arising out of the same "transaction or occurrence" as a claim within federal jurisdiction, including claims, within federal question jurisdiction, that require the joinder of additional parties, namely, defendants against whom that plaintiff has a closely related state claim. In order to minimize friction between state and federal

courts, however, Congress should direct federal courts to dismiss state claims if these claims predominate or if they present novel or complex questions of state law, or if dismissal is warranted in the particular case by considerations of fairness or economy.

***Part III contains additional material on this subject.***

Judge Campbell, Mr. Harrell, and Mrs. Motz dissent from the recommendation concerning pendent party jurisdiction.

## APPENDIX B

### House Judiciary Committee Report 101–734, pp. 27–29

### SECTION 114. SUPPLEMENTAL JURISDICTION

This [13] section implements a recommendation of the Federal Courts Study Committee found on pages 47 and 48 of its Report. The doctrines of pendent and ancillary jurisdiction, in this section jointly labeled supplemental jurisdiction, refer to the authority of the federal courts to adjudicate, without an independent basis of subject matter jurisdiction, claims that are so related to other claims within the district court's original jurisdiction that they form part of the same cases [sic] or controversy under Article III of the United States Constitution.

Supplemental jurisdiction has enabled federal courts and litigants to take advantage of the federal procedural rules on claim and party joinder to deal economically—in single rather than multiple litigation—with related matters, usually those arising from the same transaction, occurrence, or series of transactions or occurrences. Moreover, the district courts' exercise of supplemental jurisdiction, by making federal court a practical arena for the resolution of an entire controversy, has effectuated Congress's intent in the jurisdictional statutes to provide plaintiffs with a federal forum for litigating claims within original federal jurisdiction.

Recently, however, in *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), the Supreme Court cast substantial doubt on the authority of the federal courts to hear some claims within supplemental jurisdiction. In *Finley* the Court held that a district court, in a Federal Tort Claims Act suit against the United States, may not exercise supplemental jurisdiction over a related claim by the plaintiff against an additional, nondiverse defendant. The Court's rationale—that "with respect to the addition of parties, as opposed to the addition of only claims, we will not assume that the full constitutional power has been congressionally authorized, and will not read jurisdictional statutes broadly," 490 U.S. at 549–51, 109 S.Ct. at 2007—threatens to eliminate other previously accepted forms of supplemental jurisdiction. Already, for example, some lower courts have interpreted *Finley* to prohibit the exercise of supplemental jurisdiction in formerly unquestioned circumstances.[14]

Legislation, therefore, is needed to provide the federal courts with statutory authority to hear supplemental claims. Indeed, the Supreme Court has virtually invited Congress to codify supplemental jurisdiction by commenting in *Finley*, "What ever we say regarding the scope of jurisdiction * * * can of course be changed by Congress. What is of paramount importance is that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts." *Finley*, 490 U.S. at 556, 109 S.Ct. at 2010. This section would authorize jurisdiction in a case like *Finley*, as well as essentially restore the pre-*Finley* understandings of the authorization for and limits on other forms of supple-

---

**13.** The Committee expresses its appreciation to Professors Arthur Wolf and John Egnal for the able assistance they rendered the Subcommittee on Courts, Intellectual Property, and the Administration of Justice in its development of this section as introduced, and to Judge Joseph Weis and Professors Thomas Mengler, Thomas Rowe, Stephen Burbank and Larry Kramer for their considerable efforts in connection with the Subcommittee's subsequent revisions of the section.

**14.** *See, e.g., Aetna Casualty & Surety Co. v. Spartan Mechanical Corp.*, 738 F.Supp. 664, 673–77 (E.D.N.Y.1990) (impleader) (reviewing conflicting district court decisions).

mental jurisdiction. In federal question cases, it broadly authorizes the district courts to exercise supplemental jurisdiction over additional claims, including claims involving the joinder of additional parties. In diversity cases, the district courts may exercise supplemental jurisdiction, except when doing so would be inconsistent with the jurisdictional requirements of the diversity statute. In both cases, the district courts, as under current law, would have discretion to decline supplemental jurisdiction in appropriate circumstances.

Subsection 114(a) generally authorizes the district court to exercise jurisdiction over a supplemental claim whenever it forms part of the same constitutional case or controversy as the claim or claims that provide the basis of the district court's original jurisdiction.[15] In providing for supplemental jurisdiction over claims involving the addition of parties, subsection (a) explicitly fills the statutory gap noted in *Finley v. United States.*

Subsection 114 (b) prohibits a district court in a case over which it has jurisdiction founded solely on the general diversity provision, 28 U.S.C. § 1332, from exercising supplemental jurisdiction in specified circumstances.[16] In diversity-only actions the district courts may not hear plaintiffs' supplemental claims when exercising supplemental jurisdiction would encourage plaintiffs to evade the jurisdictional requirement of 28 U.S.C. § 1332 by the simple expedient of naming initially only those defendants whose joinder satisfies section 1332's requirements and later adding claims not within original federal jurisdiction against other defendants who have intervened or been joined on a supplemental basis. In accord with case law, the subsection also prohibits the joinder or intervention of persons [as] plaintiffs if adding them is inconsistent with section 1332's requirements. The section is not in-

tended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to *Finley.*[17]

---

15. In so doing, subsection (a) codifies the scope of supplemental jurisdiction first articulated by the Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

16. The net effect of subsection (b) is to implement the principal rationale of *Owen Equipment*

*& Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

17. *See Supreme Tribe of Ben–Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921); *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).