

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-25-1999

# Meritcare Inc v. St Paul Mercury Ins

Precedential or Non-Precedential:

Docket 98-3032

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Meritcare Inc v. St Paul Mercury Ins" (1999). *1999 Decisions.* Paper 20.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/20

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 25, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3032

MERITCARE INCORPORATED; MERITCARE
VENTURES, INC.; QUINLAN MEDICAL, INC.,
        Appellants

v.

ST. PAUL MERCURY INSURANCE COMPANY

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. No. 95-cv-1014)
Honorable William L. Standish, District Judge

Argued November 18, 1998

Before: McKEE, RENDELL, and WEIS, Circuit Judges

Filed January 25, 1999

        Lawrence E. Flatley, Esquire
         (ARGUED)
        Joseph W. Klein, Esquire
        Courtney C.T. Horrigan, Esquire
        Reed Smith Shaw & McClay, LLP
        435 Sixth Avenue
        Pittsburgh, PA 15219-1886
        Attorneys for Appellants

        Ronald B. Hamilton, Esquire
          (ARGUED)
        John J. Dwyer, Esquire
        Cozen and O'Connor
        1900 Market Street
        The Atrium
        Philadelphia, PA 19103
        Attorneys for Appellee

OPINION OF THE COURT

WEIS, Circuit Judge.

In this diversity case, we conclude that a plaintiff with claims less than the jurisdictional amount may not invoke supplemental jurisdiction under 28 U.S.C. S 1367 where a co-plaintiff's more substantial ones meet the requisite amount. We also decide that the District Court correctly held that the meaning of "collapse" in a property insurance policy requires a caving in or falling in of a structure and that the existence of serious impairment of structural integrity is insufficient to invoke coverage. Accordingly, we will remand the claims of one plaintiff to the state court from which it was removed, and affirm summary judgment in favor of the insurance carrier on the other plaintiff's claims.

Plaintiffs Meritcare, Inc. and Meritcare Ventures, Inc. operate a nursing home in Monroeville, Pennsylvania. They lease the structure from its owner Caring I, Ltd.1 Plaintiff Quinlan Medical, Inc. is a subsidiary of Meritcare and furnishes "liquefied" food and other products to the residents.

On December 27, 1994, Caring advised Meritcare that the roof on the nursing home was structurally unsound and posed a safety hazard. The facility was closed and all

_____

1. The parties have represented to the Court that Meritcare, Inc. and Meritcare Ventures, Inc. are both insured under the same policies and have an indivisible claim. They will frequently be referred to as "Meritcare" for convenience.

2

of its residents were moved to other institutions by January 6, 1995. They did not begin to return until after the roof replacement was completed on February 13, 1995. The nursing home did not obtain its previous occupancy level until June 15, 1995.

Defendant St. Paul Mercury Insurance Company had issued policies to Meritcare, Inc., Meritcare Ventures, Inc., and Quinlan that provided property damage and business interruption coverage. The insurance company denied plaintiffs' claims on the ground that the policies covered losses from a roof "collapse" and that in this instance the roof, although structurally unsound, did not fall in.

Meritcare, Inc., Meritcare Ventures, Inc., and Quinlan filed suit in Pennsylvania state court on June 6, 1995, claiming damages "exceed[ing] $25,000.00." St. Paul removed the case to the District Court for the Western District of Pennsylvania, and in its Notice of Removal alleged that the amount in controversy exceeded $50,000, the then-applicable amount.2

Plaintiffs did not challenge the amount in controversy at that time, nor did they move for remand at anytime. They later amended their complaint to add a claim under the Pennsylvania Bad Faith Insurer statute, 42 Pa.C.S.A. S 8371, asking for punitive damages, costs, and attorneys' fees. Meritcare also requested damages for the loss of an opportunity to purchase the facility under an option in the lease. St. Paul filed counterclaims for misrepresentation, insurance fraud, and bad faith.

In their respective pretrial statements, both the plaintiffs and defendant stated that Quinlan's compensatory claims amounted to no more than $5,000. At that point, for the first time, St. Paul challenged the District Court's jurisdiction over Quinlan's claim.

_____

2. The amount in controversy has since been increased to $75,000. See Federal Courts Improvement Act of 1996, Pub. L. 104-317, Title II, S 205(a), 110 Stat. 3850 (amending 28 U.S.C.S 1332(a), effective 90 days from enactment date of Oct. 19, 1996). Because plaintiffs' complaint was filed prior to January 1997, the applicable jurisdictional amount in this case is $50,000.

3

The District Court granted summary judgment to St. Paul, holding that the deteriorated condition of the roof was not a "collapse" under the policy and Pennsylvania law. The Court did not discuss or rule on the jurisdictional objection to Quinlan's claim. After the Court issued an order under Fed. R. Civ. P. 54(b), the plaintiffs appealed. St. Paul's counterclaims are still pending in the District Court and are not before us in this appeal.

I.

We first address the rather complicated issues raised by the fact that Quinlan's claim does not appear to meet the amount in controversy required in diversity cases. We exercise plenary review over this question of subject matter jurisdiction. See Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1044 (3d Cir. 1993).

A federal court has the obligation to address a question of subject matter jurisdiction sua sponte. See Employer's Ins. of Wausau v. Crown Cork & Seal Co., Inc., 905 F.2d 42, 45 (3d Cir. 1990). In particular, in removal cases, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. S 1447(c). As we said in Liberty Mutual Insurance Co. v. Ward Trucking Corp., 48 F.3d 742 (3d Cir. 1995), this statute enables "a district court to address the question of jurisdiction, even if the parties do not raise the issue." Id. at 750. In assessing the amount in controversy, it is also important to bear in mind that the parties may not confer jurisdiction by consent, see United Indus. Workers v. Government of the Virgin Islands, 987 F.2d 162, 168 (3d Cir. 1993), a principle that is equally applicable in removal as well as original jurisdiction cases. See Liberty Mutual, 48 F.3d at 750.

A defendant may remove a case in "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. S 1441(a). "The propriety of removal thus depends on whether the case originally could have been filed in federal court." City of Chicago v. International College of Surgeons, 118 S. Ct. 523, 529 (1997).

4

Jurisdiction under 28 U.S.C. S 1332(a) rests upon not only diversity of citizenship -- which is not in doubt here -- but also in meeting the requisite amount in controversy. Those constraints carry over to Section 1441, which is to be strictly construed against removal, see Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990), so that the congressional intent to restrict federal diversity litigation is honored. See Nelson v. Keefer, 451 F.2d 289, 293-95 (3d Cir. 1971) (federal judiciary has been "too timid" in eliminating the "plethora of cases which do not belong in federal courts").

The ad damnum clause in the complaint is often a convenient and customary reference point to ascertain the amount in controversy. However, the rules in many state courts place limits on the amounts that may be recited in ad damnum clauses. In this case, for example, in conformity with Pennsylvania state practice, the ad damnum clause states the damages requested "exceed[ ] $25,000.00," but does not specify actual damages. See Pa. R. Civ. P. 1021(b). This ad damnum clause, then, is little more than an open-ended claim that fails to answer the amount in controversy inquiry.

Even though actual damages may not be established until later in the litigation, the amount in controversy is measured as of the date of removal, a practice similar to that in original jurisdiction suits where the inquiry is directed to the time when the complaint is filed. See Pullman Co. v. Jenkins, 305 U.S. 534, 537 (1939); Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 29 (3d Cir. 1985). When it appears to a legal certainty that the plaintiff was never entitled to recover the minimum amount set by Section 1332, the removed case must remanded even if the jurisdictional deficiency becomes evident only after trial. See St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289 (1938).

As we noted in State Farm Mutual Automobile Insurance Co. v. Powell, 87 F.3d 93 (3d Cir. 1996), "[a] distinction must be made . . . between subsequent events that change the amount in controversy and subsequent revelations that, in fact, the required amount was or was not in controversy at the commencement of the action." Id. at 97 (alterations

5

in original). A respected treatise cautions that the "[f]ailure to satisfy the jurisdictional amount from the outset, although not recognized until later, is not a subsequent change that can be ignored." 15 James W. Moore et al., Moore's Federal Practice P 102.104[3], at 102–167 (3d ed. 1998). Thus, if it develops that the requisite amount in controversy was never present, even if that fact is not established until the case is on appeal, the judgment of the District Court cannot stand. See American Fire & Casualty Co. v. Finn, 341 U.S. 6, 17–19 (1951); Knop v. McMahan, 872 F.2d 1132, 1139 (3d Cir. 1989).3

A.

In circumstances where two or more plaintiffs in state court have joined their claims, a question arises whether those claims may be aggregated to meet the required jurisdictional amount on removal. There is no dispute that Meritcare's claims exceed $50,000, and if combined with Quinlan's, would total more than $50,000, the minimum required by the diversity statute at the time.

As succinctly stated in a leading treatise, the rule is "long-standing and seemingly well-settled . . . that the claims of several plaintiffs, if they are separate and distinct, cannot be aggregated for purposes of determining the amount in controversy." 14B Wright, Miller & Cooper, Federal Practice and Procedure S 3704, at 134 (1994). The rule applies even if the plaintiffs have a community of interest, but fall short of establishing a single title or right in which they have a common and undivided interest. See Thomson v. Gaskill, 315 U.S. 442, 446–47 (1942); Pinel v. Pinel, 240 U.S. 594, 596 (1916).

In such circumstances, the claims of those plaintiffs who fail to meet the amount in controversy must be remanded.

---

3. Contrast this with the situation where the requisite diversity of citizenship did not exist at the time of removal, but was remedied before judgment. See Caterpillar Inc. v. Lewis, 117 S. Ct. 467, 471 (1996); Knop, 872 F.2d at 1138. In those instances, the judgments are valid. Contrast those cases, however, with cases where a judgment, having become final and no longer appealable, may not be collaterally attacked. See Chicot Co. Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 377 (1940).

See Clark v. Gray, Inc., 306 U.S. 583, 590 (1939); see also Pinel, 240 U.S. at 596 (joinder case). Similarly, in a class action, each member of a class who does not meet the jurisdictional amount must be dismissed from the case. See Zahn v. International Paper Co., 414 U.S. 291, 301 (1973); Snyder v. Harris, 394 U.S. 332, 335-37 (1969). Although the present dispute involves parties joined for convenience, the line of cases from Pinel to Zahn applies equally to joinder cases and class actions. See, e.g., Snyder, 394 U.S. at 337 (treating class actions the same as cases with joined plaintiffs for purposes of aggregation rules); 1 Moore et al., supra, P 0.97[5], at 928-29 (1994) ("Snyder and Zahn simply mean that the aggregation rules formulated for cases involving multiple plaintiffs or defendants apply to class actions.").

Aggregation based on the total of the claims asserted by Meritcare and Quinlan in this case cannot be used to satisfy Quinlan's jurisdictional amount. Although their claims stem from the same cause -- the roof "collapse" and shared insurance coverage -- they are separate and distinct. Quinlan alleges damages that differ from those of Meritcare and are not of an undivided interest.

B.

As an alternative, Quinlan relies on supplemental jurisdiction as conferred by the Judicial Improvements Act of 1990, Pub. L. 101-650, Title III, S 310(a), 104 Stat. 5113 (codified as 28 U.S.C. S 1367). Subsection (a) of Section 1367 provides that when district courts have original jurisdiction they "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . . Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

Subsection (b), however, narrows supplemental juris- diction in cases brought solely under the diversity statute, 28 U.S.C. S 1332. In that context, supplemental jurisdiction does not extend to "claims by plaintiffs against persons made parties" under Fed. R. Civ. P. 14 (third-party

7

practice), Rule 19 (mandatory joinder), Rule 20 (permissive joinder), Rule 24 (intervention), or "over claims by persons proposed to be joined as plaintiffs under Rule 19 . . ., or seeking to intervene as plaintiffs under Rule 24 . . . when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332."

The enactment of Section 1367 was an outgrowth of a recommendation by the Federal Courts Study Committee that "Congress should expressly authorize federal courts to assert pendent jurisdiction over parties without an independent federal jurisdictional base." Report of the Federal Courts Study Committee 47 (Apr. 2, 1990) (Study Committee Report). That suggestion was based to some extent on a summary prepared for a subcommittee noting concern with the holding in Finley v. United States, 490 U.S. 545 (1989). See Report of the Subcommittee on the Federal Courts and Their Relation to the States 547 (Mar. 12, 1990) (Working Papers), reprinted in Federal Courts Study Committee, Working Papers and Subcommittee Reports, Vol. I (July 1, 1990).

In Finley, the plaintiff filed a wrongful death action in the District Court under the Federal Torts Claims Act, which provides for exclusive federal jurisdiction. See 28 U.S.C. S 1346(b). She also sought to join a state-law claim, arising out of the same factual circumstances. Because the added defendant was not of diverse citizenship, the Supreme Court held that federal jurisdiction over the state claim did not exist. See Finley, 490 U.S. at 547, 555-56. The result was that separate suits would have to be filed in both state and federal courts.

The subcommittee's Working Papers proposed that the Federal Courts Study Committee recommend legislation rejecting the holding in Finley, and restoring the previous state of the law. See Working Papers at 559-61. They also proposed a further broadening of pendent jurisdiction to provide a single forum for the disposition of related cases, and in a footnote disagreed with the holding in Zahn. See id. at 556-61 & n.33. However, somewhat inconsistently, in their primary recommendations, the Working Papers urged substantial limitations on diversity cases. See id. at 454.

The full Federal Courts Study Committee recommended that Congress substantially reduce diversity jurisdiction because of its expense to the federal system and the existence of alternate forums in state courts. See Study Committee Report at 14-15, 39-41. Consistent with that policy, the Committee also suggested that Congress enact legislation authorizing pendent jurisdiction that was limited in its scope. See id. at 47-48. The Committee did not adopt the subcommittee's footnote reference to Zahn.

The Study Committee Report advocated a narrower view of pendent jurisdiction than the Working Papers, and recommended inclusion of claims arising out of the same transaction or occurrence "including claims, within federal question jurisdiction, that require the joinder of additional parties, namely, defendants against whom that plaintiff has a closely related state claim." Id. at 47. It is clear that the Committee focused on Finley -- not Zahn -- and did not advocate substantially expanding diversity jurisdiction by "overruling" Zahn.4 See id. at 40. ("[W]e discuss broadening federal jurisdiction in certain cases that present both federal and state claims, such as cases with pendent state law claims.").

The organization of Section 1367 makes it clear that a
_____

4. In Wright, Miller & Cooper, supra, S 3523.1, at 112 n.73 (Supp. 1998), it is asserted that the Federal Courts Study Committee "explicitly recommended the statutory overruling of Zahn," citing to the Working Papers at 561 n.33. As noted here, this recommendation was not in the Report of the Federal Courts Study Committee, but in the Working Papers of a subcommittee, and was not adopted by the full Committee. To avoid such errors, the full Study Committee cautioned in the Working Papers: "[t]hese materials were valued background materials which the Committee determined should be published for general consideration whether or not the Committee agreed with their substantive proposals. . . . In no event should the enclosed materials be construed as having been adopted by the Committee." It is unfortunate that some commentators and courts have erroneously concluded that the Working Papers represented the view of the Federal Courts Study Committee. See In re Prudential Ins. Co. of America Sales Practices Litigation, 962 F. Supp. 450, 504-05 (D.N.J. 1997), aff'd on other gds., 148 F.3d 283 (3d Cir. 1998); Leszczynski v. Allianz Ins., 176 F.R.D. 659, 665-66 (S.D. Fla. 1997).

distinction is to be made between a narrow approach to diversity cases, as contrasted with a more expansive scope for other sources of jurisdiction, such as federal question litigation. This differentiation demonstrates an intent to prevent erosion of the diversity requirements through such "end-run" maneuvers as joining plaintiffs under Rules 19 or 20 after a suit is filed, when they could not have been included as parties in the original complaint. As the House Committee Report stated: "In accord with case law, the subsection also prohibits the joinder or intervention of persons a[s] plaintiffs if adding them is inconsistent with section 1332's requirements." H.R. Rep. No. 101-734, at 29, reprinted in 1990 U.S.C.C.A.N. 6860, 6875.

The limited reach of Section 1367 in diversity matters is supported by additional references in the legislative history. The House Committee was aided in its drafting by several legal scholars who had participated in the Federal Courts Study Committee's proceedings,5 and were aware of the

_____

5. See Thomas M. Mengler, Stephen B. Burbank & Thomas D. Rowe, Jr., Congress Accepts Supreme Court's Invitation to Codify Supplemental Jurisdiction, 74 Judicature 213, 216 (1991)."[T]he legislative history makes clear that section 1367 is not intended to affect their [class actions under Rule 23] jurisdictional requirements . . . . [citing Zahn]. Thus, the Supreme Court's holdings that . . . all class members must satisfy the amount in controversy requirement, remains good decisional law." Id. at 215. Section 1367 has engendered an unusually profuse and spirited academic debate. As representative -- but by no means complete -- see Richard D. Freer, Compounding Confusion and Hampering Diversity: Life After Finley and the Supplemental Jurisdiction Statute, 40 Emory L.J. 445, 471 (1991); Thomas D. Rowe, Jr., Stephen B. Burbank & Thomas M. Mengler, Compounding or Creating Confusion About Supplemental Jurisdiction? A Reply to Professor Freer, 40 Emory L.J. 943 (1991); see also Thomas C. Arthur & Richard D. Freer, Grasping at Burnt Straws: The Disaster of the Supplemental Jurisdiction Statute, 40 Emory L.J. 963, 981 (1991); Christopher M. Fairman, Abdication to Academia: The Case of the Supplemental Jurisdiction Statute, 28 U.S.C. S 1367, 19 Seton Hall Legis. J. 157 (1994); Mengler, Burbank & Rowe, Congress Accepts Supreme Court's Invitation, supra . For a listing of other scholarly
articles, see Packard, 994 F.2d at 1045 n.9.

Moore's Federal Practice takes the position that on its face the statute appears to overrule Zahn, but that was not the intent of the statute's

10

Committee's views on limiting diversity jurisdiction. The Report of the House Subcommittee flatly states that Zahn's validity was not to be affected: "The section is not intended to affect the jurisdictional requirements of 28 U.S.C. S 1332 in diversity-only class actions, as those requirements were interpreted prior to Finley." H.R. Rep. No. 101-734, at 29, reprinted in 1990 U.S.C.C.A.N. 6860, 6875 (citing Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356 (1921); Zahn v. International Paper Co., 414 U.S. 291 (1973)); see also Hearing Before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the Committee of the Judiciary on H.R. 5381, 101st Cong., 2nd Sess., Sept. 6, 1990.

Most District Courts held that Section 1367 did not overrule Zahn. See Wright, Miller & Cooper, supra, S 3523.1, at 112 (1998 Supp.). However, the first appellate ruling by the Court of Appeals for the Fifth Circuit in In re Abbott Laboratories, 51 F.3d 524, 528-29 (5th Cir. 1995), a class action, concluded that the text was clear on its face and that Zahn was overruled. The Court discussed the scholarly controversy over the matter and declined to rely on the legislative history because the statute was neither "unclear or ambiguous." Id. at 528.

The issue was next considered by the Court of Appeals for the Seventh Circuit in Stromberg Metal Works, Inc. v. Press Mechanical, Inc., 77 F.3d 928 (7th Cir. 1996). Stromberg was not a class action, but involved only two plaintiffs joined for convenience. The Court discussed the difficulties with interpretation of the statute and called attention to its text. Indicating that it was "reluctant to create a conflict among the circuits on a jurisdictional issue," id. at 930, the Court held that Section 1367 permits aggregation. See id. at 932.

_____

academic drafters or Congress. See 16 Moore et al., supra, P 106.44, at 106-62 to 106-63. Federal Practice and Procedure takes a broader view, noting as compelling evidence that overruling Zahn would be inconsistent with the often-mentioned purpose of codifying the pre-Finley conception of supplemental jurisdiction. See 13 Wright, Miller & Cooper, supra, S 3523.1, at 112 (Supp. 1998).

The Court of Appeals for the Tenth Circuit, however, did not hesitate to take issue with both Abbott and Stromberg in Leonhardt v. Western Sugar Co., ___ F.3d ____, No. 97-8078, 1998 WL 789494 (10th Cir. Nov. 13, 1998). The Court believed that section "1367(a) and (b) can be read literally, and unambiguously, to require each plaintiff in a class action diversity case to satisfy the Zahn definition of `matter in controversy' and to individually meet the $75,000 requirement." Id. at *10.

In view of the holdings of the other Courts of Appeals to the contrary, however, Leonhardt assumed ambiguity in the statutory text and turned to the legislative history. See id. There, it found substantial evidence that "Congress did not intend to overrule the historical rules prohibiting aggregation of claims, including Zahn's prohibition of such aggregation in diversity class actions." Id.

We have not yet taken a position on the proper construction of Section 1367. Although on two occasions we have called attention to the problem, we have not been required to meet it. See In re Prudential Ins. Co. of America Sales Practices Lit., 148 F.3d 283, 303-06 (3d Cir. 1998); Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1045 n.9 (3d Cir. 1993).

In Russ v. State Farm Mutual Automobile Insurance Co., 961 F. Supp. 808 (E.D. Pa. 1997), Judge Louis Pollak of the Eastern District of Pennsylvania, after a careful and exhaustive examination of the origin and legislative history of Section 1367, concluded that Zahn retained its vitality. See id. at 820. Judge Pollak's phraseology, in rejecting the textual approach of Abbott Laboratories and Stromberg, caught the eye of the Leonhardt Court: "To retain this case in this court is to say to Congress: `We know what you meant to say, but you didn't quite say it. So the message from us in the judicial branch to you in the legislative branch is: "Gotcha! And better luck next time." ' " Id. at 820; see also Leonhardt, 1998 WL 789494, at *10 n.9 (quoting Russ).

The proper construction of Section 1367 is squarely presented by this appeal, and we must therefore stake out our position. Our reading of the statute, particularly the

12

limitations placed on diversity cases in subsection (b) as contrasted with the broad scope of supplemental jurisdiction granted in other instances of federal jurisdiction in subsection (a), convinces us that Section 1367 was not intended to substantially expand diversity jurisdiction. Setting aside the holding in Zahn and Clark would have such an effect.

Subsection (b) notes a number of instances where "exercising supplemental jurisdiction . . . would be inconsistent with the jurisdictional requirements of section 1332." Although subsection (b) does not list Rule 23, the exercising of supplemental jurisdiction in class actions would certainly be inconsistent with barring it in joinder cases under Rule 19, which is cited in the text. Similarly out of keeping is subsection (b)'s prohibition of "claims by plaintiffs against persons made parties" under Rule 20, but its silence as to "claims by persons proposed to be joined as plaintiffs" under that Rule.[6]

Although there is much to be said for Leonhardt's view that the text does not displace Zahn's ruling, we conclude that there is sufficient ambiguity in the statute to make resort to the legislative history appropriate. As noted earlier, the House Report leaves no doubt that Congress intended Zahn's restrictions to remain in effect. See H.R. Rep. No. 101-734, at 29, reprinted in 1990 U.S.C.C.A.N. 6860, 6875.

_____

6. Stromberg Metal Works, Inc. v. Press Mechanical, Inc., 77 F.3d 928 (7th Cir. 1996), points out the anomaly in Section 1367(b), which lists Rule 20 among the Rules which plaintiffs may not use to bring claims "against" persons under supplemental jurisdiction, even though the text does not prohibit Rule 20 joinder of non-diverse plaintiffs. See id. at 932.
Subsection (b) denies jurisdiction over persons proposed to be joined as plaintiffs under Rule 19 or intervening under Rule 24 "when exercising supplemental diversity jurisdiction would be inconsistent with the jurisdictional requirements of section 1332." The omission of Rule 20 at that point is an unintentional drafting gap, but the legislative history provides more than adequate evidence that Congress did not intend to allow such an obvious evasion of the diversity statute. See Rowe, Burbank & Mengler, Compounding or Creating Confusion, supra, at 960 n.90. Courts should not reach out to undermine Section 1332's requirements. See id. at 961 n.91; see also Packard, 994 F.2d at 1044-45 (courts should narrowly construe the removal statute).

Even were we to conclude that Section 1367 is unambiguous, as Abbott Laboratories read it, we would nevertheless turn to the legislative history because this is one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." United States v. Sherman, 150 F.3d 306, 313 (3d Cir. 1998) (internal quotation marks removed, alterations in original); see also United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242 (1989) (same).

Our review of the text, legislative history, and origins of Section 1367 leads us to hold that it preserves the prohibition against aggregation outlined in Zahn v. International Paper Co. and Clark v. Paul Gray, Inc., and thus maintains the traditional rules governing diversity of citizenship and the amount in controversy under 28 U.S.C. S 1332.

C.

In the case before us, if the separate claims of Quinlan did not meet the jurisdictional limit of $50,000 in effect at the time of removal, they must be remanded. In its notice of removal, St. Paul alleged that the value of all of the matters in controversy would exceed $50,000. It also stated that "[p]laintiffs have previously advised St. Paul that the cost to replace the deteriorated roof exceeded $250,000.00." St. Paul did not, however, indicate the amount in controversy as to each of the three named plaintiffs.

Five months later, on November 27, 1995, the plaintiffs filed their pretrial statement, stating that Quinlan's compensatory damages were worth less than $5,000. St. Paul's pretrial statement of December 7, 1995 asserted that "Quinlan's claim of approximately $4900 is jurisdictionally insufficient." In response to St. Paul's motion for summary judgment, plaintiffs conceded that it was unlikely that even the joinder of bad faith damages would boost Quinlan's claim over the $50,000 minimum. Instead, plaintiffs argued for supplemental jurisdiction under Section 1367, citing Stromberg. Thus, more than a year before the entry of summary judgment, the jurisdictional issue had been raised, unlike cases where the problem became apparent only after judgment.

14

The burden of establishing the amount in controversy in removal cases rests on the defendant. See Abels, 770 F.2d at 29. The record here demonstrates St. Paul's failure to meet its burden, based on representations in its own pretrial statements. In addition, plaintiffs acknowledge that Quinlan's damages do not exceed $50,000, making it clear that a jurisdictional problem exists.

In Angus v. Shiley, Inc., 989 F.2d 142 (3d Cir. 1993), we concluded that removal jurisdiction established by the plaintiff's original complaint would not be destroyed by an amended complaint. See id. at 145. Here, however, both plaintiffs' and defendant's statements in the circumstances of this case make it obvious that Quinlan's compensatory damages did not exceed $5,000 at the moment of removal. See State Farm Mut. Auto. Ins. Co. v. Powell, 87 F.3d 93, 97 (3d Cir. 1996); Tonghook America, Inc. v. Shipton Sportswear Co., 14 F.3d 781, 785 (2d Cir. 1994); Jones v. Knox Exploration Co., 2 F.3d 181, 183 (6th Cir. 1993).

Quinlan also requests damages under Pennsylvania's bad faith insurer statute, including punitive damages, attorney's fees, and costs. Where a claim for punitive damages "comprises the bulk of the amount in controversy and may have been colorably asserted solely or primarily for the purpose of conferring jurisdiction, that claim should be given particularly close scrutiny." Packard, 994 F.2d at 1046.

In Suber v. Chrysler Corp., 104 F.3d 578 (3d Cir. 1997), we found it necessary to remand to the District Court to determine whether a potential award of attorneys' fees would raise the amount of damages plaintiff could claim. That further step is not required here because, as Angus observed, although a court can make an independent appraisal of the reasonable value of the claim, see 989 F.2d at 146, it might also consider a stipulation as "clarifying rather than amending an original pleading." Id. at 145 n.3. Because of Quinlan's concession that even including possible punitive and other damages, its total claim will not surpass $50,000, and because St. Paul does not argue otherwise, we need not delay our ruling at this stage.

In addition to Quinlan's concession, the record shows that Meritcare's claims for losses over and above the roof

15

repair costs and business interruption are based on the alleged bad-faith handling of the insurance claim. According to the pretrial statements, delay in adjusting the claim caused plaintiffs to lose an opportunity to purchase the nursing home from Caring. But that option was granted in the lease to Meritcare, not to Quinlan, which has no claim to any loss from that source.

Moreover, Quinlan did not incur any expense to repair the roof. Nothing in the record supports any claims by Quinlan beyond the losses it suffered via lost sales to residents of the facility during the period from December 31, 1994 to June 15, 1995. The record thus provides no basis for additional sums due Quinlan for alleged bad faith or reimbursement of attorneys' fees.

Thus, there is no necessity for a remand to determine what the record already establishes -- that Quinlan's claims do not exceed the requisite jurisdictional amount. In this state of the appeal, we will therefore exercise our authority to sever Quinlan's claims and direct that its case be remanded to the state court. See Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 827, 837 (1989) (Court of Appeals may dismiss non-diverse party on appeal).

II.

No jurisdictional obstacle appears to exist as to Meritcare and it is therefore appropriate to consider the merits of the District Court's entry of summary judgment. We exercise a plenary standard when reviewing a grant of summary judgment. See Valhal Corp. v. Sullivan Assoc., Inc., 44 F.3d 195, 200 (3d Cir. 1995). The Court of Appeals applies the same test as the District Court, and must affirm if " `there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Id. (citation omitted). " `[I]nferences ... drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.' " Id. (most alterations in original, citation omitted).

16

The District Court reviewed the undisputed facts in some detail. We may summarize them as follows. Under the terms of the Caring lease, Meritcare was to provide for maintenance and repair of the nursing home facility. Meritcare states, however, that over the years, Caring had taken responsibility for the integrity of the facility's roof.

In November 1994, Caring received a report stating that the plywood in the roof was "in an advanced stage of degradation and a[n] extremely high potential of catastrophic failure as a result of impact loads[existed] . . . . catastrophic failure may occur under severe wind or snow loads." The cause of the degradation was the application of fire-retardant chemicals to the plywood. An architectural firm made similar findings in January 1995.

St. Paul then retained an engineer to inspect the roof. He reported that there had been degradation of the plywood and the wood roof frame requiring repair or replacement. However, he said that "[t]he structural elements in the roof system are the concrete planks which have not suffered any loss of strength. General collapse of the roof into the patient rooms can not occur . . . . Even if small portions of the sheathing do fall into the attic, there would not be significant impact loading to damage the concrete planks and collapse of the roof would not occur."

The relevant portions of the St. Paul policy read: "We'll insure covered property against the risk of direct physical loss or damage involving collapse of a building or any part of a building . . . . under level 3 protection when the collapse is due to any of the [following causes, including] . . . .3. Hidden decay." However, "[c]ollapse does not include settling, cracking, bulging, shrinking, or expansion." Nor is there coverage for losses due to wear and tear, deterioration, corrosion, or the inherent nature (i.e., latent defect) of property, or for "settling, cracking, bulging, shrinking or expansion of a . . . roof or ceiling."

Meritcare contends that the collapse provision is triggered when the structural integrity of the building or a part thereof is seriously impaired. St. Paul contends that under Pennsylvania law, there had been no "collapse." It is undisputed that the roof did not cave in, and was replaced before such an adverse consequence occurred.

17

The District Court reviewed pertinent Pennsylvania case law, which culminated in a Superior Court case that held "collapse" means "to fall together or fall in." Dominick v. Statesman Ins. Co., 692 A.2d 188, 192 (Pa. Super. Ct. 1997), alloc. denied, 1998 Pa. LEXIS 466 (Pa. Mar. 18, 1998). Noting that no such event had occurred, the District Court entered summary judgment in favor of St. Paul. Because St. Paul's counterclaims remained for disposition, the District Court entered a certification offinality under Fed. R. Civ. P. 54(b) as to the summary judgment.

On appeal, Meritcare notes that the word "collapse" is not defined in the policy and is capable of several meanings, including when structural integrity is seriously impaired. It argues that to require the insured to wait until a structure falls in before making a claim is contrary to the law in a number of states, and to the holdings in some Pennsylvania trial courts. Meritcare also cites Ercolani v. Excelsior Insurance Co., 830 F.2d 31 (3d Cir. 1987), which held in favor of the insured in an analogous situation, as an example of that approach.

Unlike Ercolani, where New Jersey courts had not ruled on the "collapse" issue, we conclude that here Pennsylvania's appellate opinions control the outcome. In Skelly v. Fidelity & Casualty Co., 169 A. 78 (Pa. 1933), the damage to the insured's house consisted of a large hole in the side of the structure and demolition of part of two walls. The rest of the home stood intact. The Court denied recovery, finding that the term "collapse" was to be given its "plain, ordinary meaning." Id. at 79. Referring to dictionary definitions, the Court required a "fall[ing] together suddenly" or "[t]o fall together, or into an irregular mass or flattened form, through the loss of firm connection or rigidity and support of the parts or loss of the contents, as a building through the falling in of its sides." Id. (internal quotation marks omitted).

In Kattelman v. National Union Fire Insurance Co., 202 A.2d 66 (Pa. 1964), the Court found no collapse where a break occurred in one of the outside walls, the building broke away from the adjoining party wall, plaster fell, and doors were jammed. See id. at 67. However, the structure remained standing and none of the floors, walls or roof fell

18

in. The Court followed Skelly and concluded that the structural damage did not constitute collapse "[i]n ordinary speech." Id.

In Dominick, rotting joists caused the first floor to move downward and separate from the interior walls. The Superior Court noted that just as in Kattelman, neither the walls, floors, or roof had fallen in. Consequently, the insureds had not experienced collapse as the term is "construed under both Pennsylvania law and in accordance with its plain and ordinary meaning." Id. at 192.

These cases set out the law of Pennsylvania on the subject. We cannot, therefore, follow Ercolani where, in predicting New Jersey law, we decided that collapse meant "a serious impairment of structural integrity." Ercolani, 830 F.2d at 34. We are not free to follow New Jersey in the case before us, but must instead accept that of Pennsylvania.7 We conclude, therefore, that the District Court did not err in determining that a "collapse" did not occur and that Meritcare was not entitled to recover under the policy. Because we have concluded that no collapse occurred, we need not reach the other points raised in plaintiffs' brief.

The judgment of the District Court in favor of St. Paul and against Meritcare will be affirmed. The case of Quinlan Medical, Inc. v. St. Paul Mercury Insurance Co. will be remanded to the District Court to be remanded to the Court of Common Pleas of Allegheny County. Costs are to be shared equally.

_____

7. This case illustrates the anomalous effect of removal in many cases. Here, the issue is purely a matter of state law in which the only authoritative interpretation must come from the state court system. And yet, the insurance company removed the case from a well-respected trial court that is current in its work to the federal courts, which have only the power to predict, not settle, state law. Cases such as this lend strength to the suggestion that Congress should reinstate the requirement that before removal, a party must show prejudice would result if the case remained in the state forum. See Additional Views of Judge Merritt, Joined by Justice White, Concerning the Appropriate Jurisdiction of the Federal Courts, in Commission on Structural Alternatives for the Federal Courts of Appeals 77, 80 & n.144 (Dec. 18, 1998); see also Study Committee Report at 15.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit