Jack L. **FREEMAN** and Roberta W. Freeman, Individually and on behalf of all those similarly situated, Plaintiffs,

v.

**GREAT LAKES ENERGY PARTNERS, L.L.C., Range Resources Corporation, Range Operating Company, First Energy Trading Services, Inc., Range Energy Services Company, First Energy Corp., First Energy Services Corp., and Range Resources Development Company, Defendants.**

Vivian K. Kershaw, Individually and on behalf of all those similarly situated, Plaintiffs,

v.

Columbia Natural Resources, Inc., Columbia Gas Transmission Corp., Columbia Energy Group, and Columbia Energy Resources, Inc. Defendants.

Nos. 00–CV–204C(SR), 00–CV–246C(SR).

United States District Court, W.D. New York.

Feb. 11, 2001.

---

Harris, Beach & Wilcox, LLP (Paul J. Yesawich III and Patrick J. Maxwell, of Counsel), Rochester and Hamburg, NY, for Plaintiffs.

Hodgson, Russ, Andrews, Woods & Goodyear, LLP (Robert B. Conklin, of Counsel), Buffalo, NY, for Defendants Great Lakes Energy Partners, Range Resources Corporation, Range Operating Company, Range Energy Services Company, and Range Resources Development Company.

Connors & Vilardo, LLP (Lawrence J. Vilardo, of Counsel), Buffalo, NY, for Defendants First Energy Trading Services, First Energy Corp., and First Energy Services Corp.

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Jerry E. Rothrock, of Counsel), Washington, DC, for Defendants Columbia Energy Group and Columbia Energy Resources, Inc.

## INTRODUCTION

CURTIN, District Judge.

Presently before the court are a pair of motions to remand, which arise from two separate lawsuits: *Jack and Roberta Freeman, et al. v. Great Lakes Energy Partners, et al.*, 00–CV–204 ("*Freeman*"), and *Vivian Kershaw, et al. v. Columbia Natural Resources, et al.*, 00–CV–246 ("*Kershaw*"). Both actions were removed by the respective defendants to the Western District in March 2000. The Clerk assigned *Freeman* to this court, Item 1 (*Freeman*); and by an order dated April 20, 2000, the Honorable William M. Skretny transferred *Kershaw* to this court. Item 10 (*Kershaw*).

Although these two actions are distinct in many respects, they are broadly related in their factual background and by the fact that the representative plaintiffs—the

Freemans and Ms. Kershaw—employ the same counsel: Paul Yesawich III and Patrick Maxwell of Harris Beach & Wilcox, LLP. In addition, the two actions resemble one another in that the Freemans and Ms. Kershaw have moved this court to remand their respective actions to the New York State Supreme Court of Chautauqua County. Item 5 (*Freeman*) and Item 6 (*Kershaw*). The court granted all parties an opportunity to submit arguments on these motions to remand and then, on June 21, 2000, heard oral argument.

## BACKGROUND

Defendants in both *Freeman* and *Kershaw* are gas well operators that have entered into various leasing arrangements with members of the putative classes. The Freemans and Ms. Kershaw are landowners who hold royalty interests in gas wells operated by certain defendants. Item 5, ¶ 4 (*Freeman*) and Item 9, ¶¶ 3–4 (*Kershaw*). The majority of leases involved in these two actions grant the landowners a standard royalty of ⅛, or 12.5%, of a gas well's annual revenue. *Id.* In many cases, defendants drilled a single well that extended over several contiguous properties. As a result, many members of the putative classes actually split a ⅛ royalty with other plaintiff-landowners. In fact, both the Freemans and Ms. Kershaw submit that an average of three plaintiff-landowners hold an interest in any given well. Item 5, ¶ 4 (*Freeman*) and Item 9, ¶ 4 (*Kershaw*).

Natural gas well operators, like these defendants, sell natural gas in "Mcf's" (thousands of cubic feet). Both the *Freeman* and *Kershaw* defendants[1] paid annu-

---

1. In *Freeman,* the defendants are as follows: Great Lakes Energy Partners; Range Resources Corp.; Range Operating Co.; First Energy Trading Services, Inc.; Range Energy Services Co.; First Energy Corp.; First Ener-

gy Services Corp.; and Range Resources Development Co. For the sake of convenience and notwithstanding the fact that some of these defendants may have divergent interests, the court refers to these eight defendants

al royalties to plaintiff-landowners by multiplying the following figures:

(a) the number of Mcf's sold from a well in a year;

(b) the sale price of the gas; and

(c) the royalty percentage (1/8 or .125).

Thus, if a gas well produced 100 Mcf's in a year, at a price of $1.00 per Mcf, and a royalty rate of .125 (or 1/8), a landowner would be entitled to a royalty of $12.50. *See* Item 5, ¶ 5 (*Freeman*) and Item 9, ¶ 5 (*Kershaw*).

## FACTS

The Freemans and Ms. Kershaw claim that the *Freeman* defendants and *Kershaw* defendants, respectively, conspired to underpay the royalty interests that members of the putative classes held in natural gas wells located in, among other places, Chautauqua County, New York. Item 5, ¶ 6 (*Freeman*) and Item 9, ¶ 6 (*Kershaw*).[2]

### I. Value of Claims: Plaintiffs' Positions

#### A. Claims for Compensatory Damages

At this point in the litigation, the issue of underpayment is just an allegation. For the purposes of determining diversity jurisdiction, the court looks to plaintiffs' allegations. The Freemans allege that the *Freeman* defendants underpaid their putative class by approximately $4.00 per Mcf. *See* Item 5, ¶ 7 (*Freeman*). For her part, Ms. Kershaw states that the *Kershaw* defendants underpaid her class by approxi-

mately $3.78 per Mcf. *See* Item 9, ¶ 8 (*Kershaw*).

The Freemans and Ms. Kershaw also state that, on average, New York State natural gas wells produced approximately 3,089 Mcf's annually from the years 1994 through 1998. *See* Item 5, ¶ 8 and Exh. B (*Freeman*) and Item 9, ¶ 9 and Exh. B (*Kershaw*) (citing report from New York State's Department of Environmental Conservation ("NYS DEC"), Mineral Resources Division). Thus, in order to calculate the probable claims of each plaintiff, both the Freemans and Ms. Kershaw use the following formula:

(a) take the average production of a New York State natural gas well (3,089 Mcf's);

(b) multiply by the estimated amount of underpayment to the plaintiff class ($4.00 in *Freeman* and $3.78 in *Kershaw*);

(c) multiply by the royalty interest of ⅛, or .125;

(d) multiply by six, which represents the number of years for which plaintiffs may recover once the statute of limitations for fraud is applied; and

(e) divide by three, which represents the number of plaintiff-landowners who typically held interests in the same well.

In this way, the Freemans estimate that a typical member of their putative class will have a claim for compensatory damages of just under $3,100.[3] Similarly, Ms. Ker-

---

as "the *Freeman* defendants." In *Kershaw*, the defendants are as follows: Columbia Natural Resources, Inc.; Columbia Gas Transmission Corp.; Columbia Energy Group; and Columbia Energy Resources, Inc. Again, only for the sake of convenience, the court refers to these four defendants as "the *Kershaw* defendants."

**2.** By their respective complaints, the Freemans and Ms. Kershaw assert various state-law claims against defendants for breach of contract, breach of the implied covenant to market, common law fraud, unjust enrichment, tortious interference, an accounting, and breach of fiduciary duty. *See, e.g.*, Item 1, Exh. A, ¶ 53, *et seq.* (*Freeman*).

**3.** The Freemans calculate as follows: 3089

shaw estimates that the typical member of her plaintiff class will have a compensatory claim of just under $3,000.[4]

### B. Claims for Punitive Damages

In addition to their compensatory claims, both the Freemans and Ms. Kershaw have asserted $100,000,000 claims for punitive damages on behalf of their putative classes. *See* Item 5, ¶ 14 (*Freeman*) and Item 9, ¶¶ 16–17 (*Kershaw*). The Freemans estimate that there are approximately 26,600 members of their plaintiff class. Item 5, ¶ 16.[5] For her part, Ms. Kershaw estimates that there are approximately 24,000 members of her plaintiff class.[6] Thus, the Freemans allege that each member of their plaintiff class would be entitled to approximately $3,700 in punitive damages, Item 5, ¶ 17, and Ms. Kershaw estimates that each member of her plaintiff class would be entitled to approximately $4,167 in punitive damages. Item 9, ¶ 17.

### II. Value of Claims: Defendants' Positions

In opposition to the Freemans' estimates of the likely value of individual claims, *Freeman* defendant Great Lakes Energy Partners submits proof tending to show that *certain* unnamed plaintiff class members could have claims well in excess of $75,000. For example, statistics com-piled by the NYS DEC's Mineral Resources Division show that since 1982, some natural gas wells in New York have produced close to 600,000 Mcf's. *See* Item 18, pp. 6–7 and Exh. A. Thus, certain prospective members of either putative class could be entitled to compensation of approximately $300,000, if that person had held rights in such a well since 1982. *See supra* n. 3 (dismissing plaintiffs' attempt to apply statute of limitations defense prematurely). On the other hand, if, as plaintiffs aver, three landowners shared an interest in one such well, then there would be three claims of $100,000.

Similarly, the *Kershaw* defendants submit evidence tending to demonstrate that Ms. Kershaw herself may have a claim in excess of $75,000. *See* Item 19, Exh. 1 (*Kershaw*). First, Ms. Rebekah Barnes, a Senior Prospect Engineer with defendant Columbia Natural Resources, reports that Ms. Kershaw's lease is connected with a well that has produced over 48,000 Mcf's of gas between 1981 and 1993. If Ms. Kershaw's well has continued to produce similar amounts of gas for the rest of the 1990s, Ms. Kershaw would likely claim compensatory damages of approximately $30,000. In addition, Ms. Barnes projects that the Kershaw well will produce another 32,000 Mcf's in its lifetime. Item 19, Exh. 1. Thus, the value of Ms. Kershaw's

---

Mcf × $4.00 × .125 × 6 ÷ 3 = $3,089.

**4.** Ms. Kershaw calculates as follows: 3089 Mcf × $3.78 × .125 × 6 ÷ 3 = $2,919.

**5.** The Freemans reach this figure in the following way: (1) the *Freeman* defendants operated approximately 740 wells in New York State as of 1998. *See* Item 5, ¶ 15 and Exh. D. (2) The *Freeman* defendants also are said to operate wells in eleven other states besides New York. *Id.* ¶ 16.(3) If the *Freeman* defendants operate at least 700 wells in each of those other eleven states, then they operate more than 8,000 wells overall.(4) Taken fur-ther, if three plaintiff-landowners typically hold royalty interests in a single well, then there are approximately 26,600 members of the *Freeman* plaintiff class.

**6.** Ms. Kershaw submits direct evidence that the *Kershaw* defendants operate 8,000 natural gas wells throughout the United States. *See* Item 9, ¶ 16 and Exh. D (*Kershaw*). Kershaw derives her projection of 24,000 class members by multiplying that number of wells—8,000—by three, which is purportedly the average number of plaintiff-landowners who hold interests in the same well. *Id.*

past damages, combined with the value of injunctive relief, would be approximately $45,000, *see* Item 19, p. 6, which is significantly more than the $7,200 Ms. Kershaw projects. Item 8, ¶ 6 (*Kershaw*).

Further, Ms. Barnes reports that at least seven members of the *Kershaw* putative plaintiff class "would have received in excess of $75,000 in additional royalty payments for the 6 year period between 1994 through 1999 if the actual calculated royalty volumes were multiplied by 3.78." Item 19, Exh. 1, ¶ 5 (*Kershaw*).

### III. Court's Conclusion on Value of Claims

For the reasons explained herein, the court finds that the likely value of a claim by an average member of the *Freeman* class would be approximately $16,000, while the likely value of a claim by an average member of the *Kershaw* class would be approximately $21,000.

#### A. *Claims for Compensatory Damages*

Although the Freemans project that a typical member of their class will have a compensatory claim of almost $3,100, the court finds that a more accurate projection would amount to just under $10,300.[7] Similarly, while Ms. Kershaw estimates that the typical member of her plaintiff class will have a compensatory claim of just under $3,000, the court finds that a

more accurate projection would reach just over $9,730.[8]

#### B. *Claims for Punitive Damages*

The Freemans insist that there will likely be over 26,000 members of their class once it is certified. *See* Item 5, ¶ 15 and Exhs. D, E (*Freeman*). Similarly, Ms. Kershaw maintains that there will be over 24,000 members of her class once it is certified. *See* Item 9, ¶ 16 and Exh. D (*Kershaw*). Thus, claims for punitive damages would amount to little more than $3,850 for each member of the *Freeman* class, and $4,200 for each member of the *Kershaw* class.

The *Freeman* defendants argue that there will only be 740 potential *Freeman* plaintiffs. *See* Item 18, p. 12 (*Freeman*) (yielding punitive damages claim of $135,000 for each class member). However, the *Freeman* defendants base their calculation of the putative class size strictly on the number of wells allegedly operated by the defendants in New York State, which is 740. *Id.* For reasons set forth *infra,* the court rejects the idea that the value of plaintiffs' claims must be allocated on a per-well basis.

In any event, the Freemans state that the defendants operate natural gas wells in *eleven states* besides New York. *See* Item 5, ¶ 16 and Exh. E. The *Freeman* defen-

---

7. The Freemans calculate as follows: 3089 Mcf × $4.00 × .125 × 6 ÷ 3 = $3,089. However, the court calculates likely compensatory damages more realistically by removing the prematurely asserted statute of limitations defense. Thus: 3089 Mcf × $4.00 × .125 × **20** ÷ 3 = $10,296. *See St. Paul Mercury Indemnity v. Red Cab Co.,* 303 U.S. 283, 292, 58 S.Ct. 586, 82 L.Ed. 845 ("[T]he fact that it appears from the face of the complaint that the defendant has a valid defense, if asserted, to all or a portion of the claim … will not [require] remand."). Evidence suggests that many of the relevant gas wells began production in the early 1980s. *See*

Item 18, Exh. A (*Freeman*) and Item 19, Exh. 1 (*Kershaw*). Thus, using 1980 as a conservative starting point, it is appropriate to use 20 years as the relevant number of years for which damages could be claimed.

8. Ms. Kershaw calculates as follows: 3089 Mcf × $3.78 × .125 × **6** ÷ 3 = $2,919. However, as with *Freeman,* the court calculates these likely compensatory damages more realistically by removing the asserted Statute of Limitations defense: 3089 Mcf × $3.78 × .125 × **20** ÷ 3 = $9,730.

dants apparently operate 740 wells in New York State alone. Thus, the number of wells at issue in *Freeman* is bound to be much greater than the 740 cited by the *Freeman* defendants. Conservatively, the number of wells at issue in *Freeman* could amount to 4,000 to 5,000 wells in all.[9] Thus, the likely number of members in the *Freeman* plaintiff class would be approximately 14,400. In that case, each member of the putative *Freeman* class would have a punitive damages claim of just under $7,000.

The *Kershaw* defendants insist that any putative class will be "significantly fewer than [the] 24,000 claimants" that Ms. Kershaw estimated in her moving papers. Item 19, p. 8 (*Kershaw*) (assailing Ms. Kershaw's estimates of plaintiff class's size as "wildly unscientific"). The *Kershaw* defendants believe that the court could reasonably set the number of putative plaintiffs at 8,000, which is the number of wells that Ms. Kershaw alleges the defendants operate in various states. *See* Item 19, p. 8.

Even if the court were to agree with the *Kershaw* defendants, and allocated punitive damages on a per-well basis and assumed that there were 8,000 wells at issue, a typical member of the Kershaw putative class would still only have a punitive damages claim of approximately $12,500.

## DISCUSSION

### I. Standard of Law

As a general matter, district courts may exercise diversity jurisdiction only where: (1) the parties are completely diverse; and (2) the amount in controversy exceeds $75,000, exclusive of interests and costs.

28 U.S.C. § 1332(a). The parties in *Freeman* and *Kershaw* agree that the diversity requirement has been met. Both the Freemans and Ms. Kershaw, however, deny that the defendants can show that the amount-in-controversy requirement is satisfied.

■■■ Courts in this circuit must "construe the removal statute narrowly, resolving any doubts against removability." *Somlyo v. J. Lu–Rob Enters., Inc.,* 932 F.2d 1043, 1046 (2d Cir.1991). Moreover, defendants who seek to remove an action to federal court have an initial burden of showing that there is a "reasonable probability" that the amount in controversy requirement will be met. *United Food & Commercial Workers Union, Local 919, AFL–CIO v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 304–05 (2d Cir.1994). Further, "the party asserting jurisdiction must support those facts with 'competent proof' and 'justify [its] allegations by a preponderance of evidence.'" *Id.* at 305 (quoting *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). In many instances, a removing defendant will satisfy this burden by relying on allegations contained in the plaintiff's complaint. *See, e.g., Cygielman v. Cunard Line Ltd.,* 890 F.Supp. 305, 306 (S.D.N.Y.1995) ("In this Circuit, the damage allegations in the complaint ordinarily must be taken at face value . . . .").

■■■ If the removing defendant is able to meet its initial burden, the burden shifts back to plaintiff to show, by a legal certainty, that the claim is actually for $75,000 or less. *See Stott v. Revere Transducers, Inc.,* 993 F.Supp. 125, 127 (N.D.N.Y.1998).

---

**9.** That is, if the *Freeman* defendants operate only one-half or even one-third as many gas wells in the other eleven states as they do in New York, then the *Freeman* defendants would be operating anywhere from 4,000 to 5,000 wells throughout the United States. *See* Item 5, ¶¶ 14–17.

## II. Attributes' Fees

### II. Attorneys' Fees

■ As a threshold matter, the court finds that defendants cannot rely on a potential award of attorneys' fees in a class action in order to show a reasonable probability that the jurisdictional minimum has been met.

New York State's CPLR § 909 provides that "[i]f a judgment in an action maintained as a class action is rendered in favor of the class, the court in its discretion may award attorneys' fees to the representatives of the class based on the reasonable value of legal services rendered and if justice requires, allow recovery of the amount awarded from the opponent of the class." Thus, section 909 "provides for two contingencies: first, the court can award attorneys' fees and order that they be taken out of the judgment; second, the court can award attorneys' fees to be paid by the class opponent. *It is only the latter which augments the amount in controversy.*" *Trapanotto v. Aetna Life Ins. Co.,* 1996 WL 417519, at *9 n. 5 (S.D.N.Y. July 25, 1996) (emphasis added).

In *Trapanotto,* Judge Preska went on to hold:

I must certainly decline at this early stage of the litigation to find that "justice requires" attorneys' fees, if awarded, should be awarded from the class opponent rather than taken out of the judgment. To do so now would be premature....

The class here has not yet been certified. Without certification, of course, it is impossible to award fees under § 909. Even if a class was certified, there is no factual predicate to estimate reasonably the representative plaintiff's own damages, other than to assume, given the nature of the case, that they are small. Nor is there any basis to estimate reasonably the amount of work required for the case, the value of that work to the

class, or the likely amount of attorneys' fees, much less what fees would be "reasonable." Hence, there is an inadequate basis from which to infer that, even after adding attorneys' fees to the plaintiff's damages, the [jurisdictional] threshold would be met....

I decline to add prospective attorneys' fees to plaintiff's damages in order to satisfy § 1332's amount-in-controversy requirement.

1996 WL 417519, at *9–10 (citation and footnote omitted). In the wake of *Trapanotto,* many district courts have concurred in Judge Preska's reasoning and conclusion. *See, e.g., Colon v. Rent–A–Center, Inc.,* 13 F.Supp.2d 553, 561 (S.D.N.Y.1998).

Both the *Freeman* and *Kershaw* defendants urge this court to reject *Trapanotto* and its progeny.

Instead of considering whether it was clear to a legal certainty that plaintiff could *not* obtain an award of attorneys' fees before eliminating statutory attorneys' fees from the amount-in-controversy inquiry, *Trapanotto* and its progeny effectively considered whether or not it was clear to a legal certainty that the named plaintiffs *could* obtain such an award—a 180–degree reversal from what controlling precedent actually requires. This Court should not perpetuate the error.

Item 19, pp. 9–10 (*Freeman* ). The court disagrees with defendants' understanding of Judge Preska's analysis. *Trapanotto* does not depart from settled law by requiring proof that there *is* a legal certainty that plaintiffs *will* receive an award of attorneys' fees. Rather, under *Trapanotto,* a removing defendant cannot establish a "reasonable probability" of meeting the amount-in-controversy requirement when it relies on a *potential* award of attorneys' fees as part of its proof. In essence, *Tra-*

*panotto* and other courts have acknowledged that it would prove too speculative to base diversity jurisdiction on an uncertain award of attorneys' fees.

Like several other courts, this court endorses Judge Preska's reasoning and conclusion in *Trapanotto*. Therefore, the court will not consider the Freemans and Ms. Kershaw's demand for attorneys' fees when inquiring as to whether the amount-in-controversy has been met.

## III. Supplemental Jurisdiction

### A. *Zahn v. International Paper Co. & Enactment of 28 U.S.C. § 1367*

■ In *Zahn v. International Paper Co.*, 414 U.S. 291, 294–300, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), the Supreme Court held that each member of a putative plaintiff class must individually satisfy the minimum amount-in-controversy requirement under 28 U.S.C. § 1332(a). In 1990, Congress passed the Judicial Improvements Act, which was codified at 28 U.S.C. § 1367. In relevant part, section 1367 reads:

> (a) ... [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy .... Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.
>
> (b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsec-

tion (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, 24 of the Federal Rules of Civil Procedure ....

28 U.S.C. § 1367.

Ever since section 1367 was enacted, courts have widely disagreed over whether *Zahn* is still good law. *See E.R. Squibb & Sons v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 934–35 (2d Cir.1998) (recognizing disagreement but not ruling on the issue).[10] In *Free v. Abbott Laboratories*, the Fifth Circuit held that "under § 1367, a district court can exercise supplemental jurisdiction over members of a class, although they did not meet the amount-in-controversy requirement, as did the class representatives." 51 F.3d 524, 529 (5th Cir. 1995) (*In re Abbott Laboratories*). The court in *Abbott Labs* based its conclusion on the fact that section 1367 does not exempt Rule 23's class actions from its reach, while making specific exceptions for other portions of the Federal Rules of Civil Procedure. 51 F.3d at 529–30.

Subsequently, the Seventh Circuit endorsed *Abbott Labs* in a case in which there were only two named plaintiffs—one of whom met the jurisdictional minimum and one who did not. *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 930 (7th Cir.1996). The court in *Stromberg* relied on *Abbott Labs* and ruled that section 1367 also gave district courts supplemental jurisdiction over individually named plaintiffs who did not meet the jurisdictional minimum, provided that another individually named plaintiff did satisfy that threshold. *Id.* at 931. In this way, the Seventh Circuit found that section 1367 had overruled the Supreme Court's decision in *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001

---

**10.** In *Briggs v. Goodyear Tire & Rubber Co.*, this court also recognized the dispute regarding whether *Zahn* survived section 1367's en-

actment. 79 F.Supp.2d 228 (W.D.N.Y.1999). In the context of the present motions, the court considers this dispute more closely.

(1939), in the same way that it had overruled *Zahn. Stromberg*, 77 F.3d at 930–31 ("Section 1367(a) has changed the basic rule by authorizing pendent-party jurisdiction, and that change affects *Clark* and *Zahn* equally.").

On the other hand, both the Third Circuit and Tenth Circuit have found that *Zahn* survived section 1367's enactment. In *Leonhardt v. Western Sugar Co.*, 160 F.3d 631 (10th Cir.1998), the Tenth Circuit found that section "1367(a) and (b) can be read literally, and unambiguously, to require each plaintiff in a class action to satisfy the *Zahn* definition of 'matter in controversy' and to individually meet the $75,000 requirement." *Id.* at 640.

Using different reasoning, the Third Circuit reached the same conclusion as the Tenth in *Meritcare, Inc. v. Paul Mercury Ins. Co.*, 166 F.3d 214 (3d Cir.1999). There, the court found that section 1367 was, in fact, ambiguous when it came to asserting supplemental jurisdiction over a class of plaintiffs, and that a review of the legislative history was therefore appropriate. *Id.* at 221–22. Section 1367's legislative history convinced the court that Congress had intended to leave *Zahn* untouched when it enacted section 1367. *Id.* at 222 (citing H.R.Rep. No. 101–734, at 29, *reprinted in* 1990 U.S.C.C.A.N. 6860, 6875).

The Second Circuit has not yet addressed this issue. However, every district court in this circuit that has addressed the issue has held that *Zahn* is still good law. In 1993, Judge Louis Freeh of the Southern District issued this circuit's lead case on the issue: *Benfield v. Mocatta Metals*, 1993 WL 148978 (S.D.N.Y. May 5, 1993). Like the Third Circuit in *Meritcare*, Judge Freeh based his decision on section 1367's legislative history, which revealed a clear intent to preserve *Zahn. Id.* at *4.

Each district court from this circuit that has subsequently addressed this issue has relied on *Benfield*, and has found that *Zahn* survived section 1367's enactment. *See, e.g., Greenberg v. Trace National Holdings, Inc.*, 1999 WL 587935, at *3 (S.D.N.Y. Aug. 4, 1999); *Colon v. Rent–A–Center, Inc.*, 13 F.Supp.2d 553, 562 (S.D.N.Y.1998); *McGowan v. Cadbury Schweppes, PLC*, 941 F.Supp. 344, 348 (S.D.N.Y.1996) (all relying on *Benfield* and section 1367's legislative history).

 This court agrees with the district courts of this circuit, and with the Third Circuit, and finds that the language of section 1367(a) and (b) is sufficiently ambiguous to make inquiry into its legislative history appropriate. *See Meritcare*, 166 F.3d at 221 & n. 6. Again, that legislative history clearly demonstrates that Congress intended to preserve *Zahn* when it enacted section 1367. "[Section 1367] is not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to *Finley*." H.R.Rep. No. 101–734, at 29, *reprinted in* 1990 U.S.C.C.A.N. 6860, 6875 (citing *Zahn* as among decisions Congress intended to preserve). In light of this court's finding that *Zahn* survives section 1367's enactment, the court grants the Freemans and Ms. Kershaw's motion to remand, since the records in both *Freeman* and *Kershaw* demonstrate that the large majority of potential plaintiffs in both cases will fail to satisfy the amount-in-controversy requirement. Indeed, the Freemans have shown that the average class member will likely have a claim of approximately $16,000. *See supra* Facts, Part III (detailing average compensatory and punitive claims for members of *Freeman* class). For their part, the *Freeman* defendants only argue that a limited number of class members

would have claims in excess of $75,000. *See* Item 18, pp. 6–8 and Exh. A.

Similarly, the court finds that the average *Kershaw* class member would likely have a claim of approximately $21,500. *See supra* Facts, Part III (detailing typical compensatory and punitive claims for member of *Kershaw* class). The *Kershaw* defendants do little to challenge this view of the *Kershaw* class as a whole, and only assert that "seven royalty owners ... would have received in excess of $75,000 ... between 1994 through 1999 ...." Item 19, Exh. 1, ¶ 5.

Thus, the court finds that the majority of the *Freeman* and *Kershaw* plaintiff class members would not have claims in excess of $75,000, and that any members who could satisfy the jurisdictional minimum would be in the decided minority.

> Although the Supreme Court held in *Zahn* ... that any plaintiff without the jurisdictional amount had to be dismissed from a class action suit brought by plaintiffs in federal court, the court does not read *Zahn* as mandating an involuntary division of an otherwise proper class action suit through a remand of only those plaintiffs' claims which do not exceed [$75,000].

*Craig v. Congress Sportswear, Inc.*, 645 F.Supp. 162, 166 (D.Me.1986). Nevertheless, this court finds that a total remand of both actions would prevent an undesirable outcome of having parallel complex litigation in federal and state courts. *See National Organization for Women v. Mutual of Omaha Insurance Co.*, 612 F.Supp. 100, 104 (D.D.C.1985) (finding remand of entire action required where "there is no conceivable way that the class described by the plaintiffs could be made up entirely—or even substantially—of claims of more than [$75,000]"). Thus, the court finds that the wisest course is to remand these actions in their entirety.

### B. Plaintiffs Prevail Even Under Abbott Labs

#### 1. Original Jurisdiction over Representative Plaintiffs

Even if this court were inclined to disagree with the district courts of this circuit, as well as the Third Circuit, and held that section 1367 has overruled *Zahn,* the court would still need to decide whether, under *Abbott Labs,* defendants in either case have established this court's *original* jurisdiction over the class representatives.

Under *Abbott Labs,* the court would have supplemental jurisdiction over both putative plaintiff classes only if it also had original jurisdiction over the representative plaintiffs.[11] For reasons stated *infra,* the court finds that it would lack original jurisdiction over the representative plaintiffs in both *Freeman* and *Kershaw.* Thus, even under *Abbott Labs,* the court would grant plaintiffs' motions.

#### 2. Claims for Compensatory Damages

With respect to Jack and Roberta Freeman, the *Freeman* defendants submit proof that prospective members of the *Freeman* class who are not named and have yet to be identified would be entitled to compensation of approximately

---

**11.** A point of clarification is in order. Both the *Freeman* and *Kershaw* defendants rely on *Abbott Labs* and *Stromberg* for the proposition that section 1367 "grants supplemental jurisdiction over the entire plaintiff class so long as the Court has jurisdiction over any single member." Item 18, p. 5 (*Freeman*); *see also* Item 19, p. 13 (*Kershaw*) (echoing same argument). Here, the *Freeman* and *Kershaw* defendants read *Abbott Labs* too broadly. Again, section 1367 allows the court to exercise supplemental jurisdiction over unnamed plaintiff class members *only* when it can be shown that the *named* class representatives satisfy the minimum amount in controversy requirement.

$300,000. *See, e.g.*, Item 18, p. 7 (*Freeman*). However, the *Freeman* defendants submit no evidence to support the inference that either Jack or Roberta Freeman would be entitled to compensatory damages in excess of $75,000.

Rather, Jack Freeman submits an affidavit in which he suggests that his likely claim for compensatory damages would amount to just over $2,900. Item 7, ¶ 6 (*Freeman*).[12] As a practical matter, the court finds that Jack Freeman probably underestimates his compensatory damages, and that the Freemans' compensatory claim could actually amount to somewhere between $8,000 to $9,000. *See supra* nn. 3 & 7 (dismissing plaintiffs' attempt to apply Statute of Limitations defense prematurely under *St. Paul* decision).

With respect to Ms. Kershaw, the *Kershaw* defendants submit evidence demonstrating that Ms. Kershaw's overall claim for compensatory damages could amount to a little more than $45,000, *see* Item 19, pp. 6–7 and Exh. 1 (*Kershaw*), as opposed to the $7,218 that Ms. Kershaw estimated in her own affidavit, *see* Item 8, ¶ 6 (*Kershaw*).

Neither the *Freeman* defendants nor the *Kershaw* defendants provide evidence to show that there is a reasonable probability that the representative plaintiffs will have claims for compensatory damages in excess of $75,000.

### 3. *Aggregation of Plaintiffs' Claims for Punitive Damages*

■ However, the Freemans and Ms. Kershaw also assert claims for punitive damages in the amount of $100,000,000.

*See* Item 1, Exh. A, p. 26 (*Freeman*) and Item 11, p. 22 (*Kershaw*). Thus, the court must also assess whether these claims for punitive damages contribute to the satisfaction of the amount-in-controversy requirement.

In order to assess whether plaintiffs' claims for *punitive* damages can be aggregated for the purposes of meeting the amount-in-controversy requirement, the court must inquire whether plaintiffs' underlying claims for *actual* damages may be aggregated. *See Gilman v. BHC Securities, Inc.*, 104 F.3d 1418, 1430–31 (2d Cir. 1997).

In a class action, the value of an individual plaintiff's claim is measured simply by assessing the value of that individual claim. However, there is a "common fund" exception to this rule. *See id.* at 1422.

On this count, both the *Freeman* and *Kershaw* defendants assert that it is appropriate to aggregate the individual plaintiffs' compensatory—and punitive—damages claims on a *per-well* basis. That is, defendants assert that the *size* of the putative classes must be measured not by the total number of persons holding royalty interests in defendants' wells, but by "the number of—the individual wells operated by the defendants." Item 18, p. 11 (*Freeman*).

In support of this argument, both the *Freeman* and *Kershaw* defendants cite to *Rocket Oil & Gas Co. v. Arkla Exploration Co.*, 435 F.Supp. 1303 (W.D.Okla.1977). In *Rocket Oil*, the plaintiff brought suit "on behalf of the royalty owners entitled to be paid royalties under the terms of either certain oil and gas leases or a pooling

---

**12.** The Freemans' attorney arrives at this number for compensatory damages by taking the average yield of the Freemans' two wells—2046 Mcf's—and multiplying that figure by an alleged $4.00 underpayment and a royalty interest of 5.95%. Freemans' attorney then multiplies that figure by six years—which they presume to be the applicable statute of limitations.

order of the Oklahoma Corporation Commission." 435 F.Supp. at 1304. The plaintiff claimed that the defendants had "breach[ed] their obligation under said leases and pooling order to obtain the best price available for the gas produced from the well." *Id.* The defendants removed the case to federal court, and the plaintiff filed a remand motion. One of the plaintiff's arguments was that many class members' individual claims did not satisfy the amount-in-controversy requirement. The trial court rejected that argument, finding the class members' claims could be aggregated because each had "a common and undivided interest in the ⅛ royalty interest in all gas produced from the pooled formation by virtue of the communitization of their fractional mineral interests under the pooling order." *Id.* at 1305.

This court declines to rely on *Rocket Oil.* First, unlike *Rocket Oil,* there is no pooling order in the present case. Furthermore, neither the Freemans, Ms. Kershaw, nor any member of the putative plaintiff classes have been shown to share an "undivided interest" in royalties produced from a single well. Rather, the Freemans' and Ms. Kershaw's gas leases show that they entered into separate leasing agreements and, as a result, hold separate and distinct interests in gas royalties.

Specifically, the leases held by the Freemans and Ms. Kershaw grant them a "royalty ... equal to one-eighth of the price received at the wellhead or lease line of all gas saved and marketed from the said Premises ...." Item 1, Exh. A, Annexed Copy of Lease, ¶ 6 (*Freeman*); *see also* Item 3, Exh. A, ¶ 2 (*Kershaw*).

In addition, the Freemans' lease allows the well operator to consolidate the Freemans' property with adjacent property in order to create one well, and provides that in such a case the Freemans will be entitled to a proportional share of the well's revenue and "no more." Item 1, Exh. A, Annexed Copy of Lease, ¶ 5 (*Freeman*). Likewise, Ms. Kershaw's lease gives the well operators the "the right to consolidate the leased premises ... with other lands," in which case Ms. Kershaw would receive her proportional share of the well's revenues. *See* Item 3, Exh. A, ¶ 7 (*Kershaw*). Both the Freemans and Ms. Kershaw, then, hold separate and distinct interests in either the royalties produced from a well that is wholly located on their property, or a *proportional* share of royalties from a well located on the property of several landowners.

In *Leroy Cattle Co., Inc. v. Fina Oil & Chemical Co.,* 1994 WL 151105 (D.Kan. Mar.2, 1994), Judge Belot faced an almost identical set of facts as are alleged in this case, and distinguished *Rocket Oil* in the following way:

> The *Rocket Oil* decision is clearly predicated on the existence of a unique "pooling order" which, ... cannot be likened to [plaintiff's Contract].... Each of the potential class members in the present case, unlike the class members in *Rocket Oil,* has his own independent claim predicated on his own "separate and distinct" royalty interest. The individual right of one royalty owner to recover, as well as the amount of his recovery, is not affected by any of the other royalty owners' rights or amounts of recovery. As [plaintiff] points out, if [defendant] were to successfully defend against one class member's claim, the other royalty owners' actions would remain intact.... [T]he interests of the class members in this case are more like the "separate and distinct" interests ... than the "pooled" or "communitized" interests of the plaintiffs in *Rocket Oil.*

*Leroy Cattle,* 1994 WL 151105, at *6.

This court is persuaded that the members of the *Freeman* or *Kershaw* putative

classes would not be able to aggregate their claims for compensatory damages because their claims all arise from separate and distinct contractual rights, which are contained in their respective leasing agreements. As such, the court also finds that the *Freeman* and *Kershaw* plaintiffs' claims for punitive damages are separate and distinct and cannot be aggregated in order to satisfy the amount-in-controversy requirement.

### 4. *Total Value of Representative Plaintiffs' Claims*

The remaining issue is whether there is a reasonable probability that the Freemans and Ms. Kershaw have satisfied the amount-in-controversy requirement by asserting compensatory claims, as well as claims for punitive damages in the amount of $100,000,000.

#### a. Value of the Freemans' Claims.

The court has previously found that the Freemans' claims for compensatory damages could amount to somewhere between $8,000 to $9,000, and that their claim for punitive damages would be approximately $7,000. *See supra* Discussion Part III(B)(2) (compensatory) and Facts, Part III (punitive). Thus, the record tends to show that the Freemans have an overall claim of approximately $16,000—well below the jurisdictional minimum.

#### b. Value of Ms. Kershaw's Claims.

The record shows that Ms. Kershaw's claim for compensatory damages could, at most, amount to approximately $45,000, and that her claim for punitive damages would be approximately $12,500. *See supra* Discussion, Part III(B)(2) (compensatory) and Facts, Part III (punitive). Taken together, then, the record reveals that Ms. Kershaw likely has a claim of no more than $57,500, which is, again, not enough

to satisfy the amount-in-controversy requirement.

In light of the foregoing, the court finds—even under *Abbott Labs* and *Stromberg*—that the *Freeman* and *Kershaw* defendants have failed to establish a reasonable probability that the court has original jurisdiction over either the Freemans or Ms. Kershaw since none of them satisfies the amount-in-controversy requirement of section 1332(a).

## CONCLUSION

The court grants plaintiffs' motions to remand because, under *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511, both the *Freeman* and *Kershaw* defendants have failed to show a reasonable probability that the members of the putative classes would satisfy the amount-in-controversy requirement of 28 U.S.C. § 1332(a). Furthermore, even assuming *arguendo* that *Abbott Labs* controls, the court finds that the *Freeman* and *Kershaw* defendants have failed to establish a reasonable probability that the representative plaintiffs meet the jurisdictional minimum. As such, the court grants plaintiffs' motions to remand in both the *Freeman* and the *Kershaw* matters.

So ordered.